**TURNBULL, INC., Transferee (Formerly J. Gordon Turnbull, Inc.), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

No. 22174.

United States Court of Appeals Fifth Circuit.

Feb. 1, 1967.

Rehearing Denied March 22, 1967.

Robert Edwin Davis, Wentworth T. Durant, Ronald M. Mankoff, Durant, Mankoff & Davis, Dallas, Tex., for petitioner.

Lester R. Uretz, Chief Counsel, I. R. S., Glen E. Hardy, Atty., I. R. S., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Crombie J. D. Garrett, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Richard M. Roberts, Acting Asst. Atty. Gen., for respondent.

Before RIVES, WISDOM and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This taxpayer's petition for review of an adverse decision of the Tax Court involves a complicated set of facts in which three corporations, J. Gordon Turnbull, Inc., taxpayer, H. R. Henderson and Company and Price Construction Company, as well as two individuals, Cameron McElroy, Jr. and H. R. Henderson, are the principal participants.

The story begins chronologically with the incorporation of J. Gordon Turnbull, Inc. (JGT) under the laws of Ohio in August 1941. The corporation was authorized to furnish engineering, architectural and construction management services in connection with the building of large structures. Its controlling stockholder, president and chief executive was J. Gordon Turnbull, who died on April 1, 1953.

H. R. Henderson and Company (Henderson), a Texas corporation, was organized on January 3, 1946 and continued in existence through December 31, 1957, when it was merged into its subsidiary, J. Gordon Turnbull, Inc., and the name of the surviving corporation was changed to Turnbull, Inc. (taxpayer). Price Construction Company (Price), a Texas corporation, was organized on May 1, 1948.

On December 15, 1953, Henderson's Board of Directors authorized its president, Cameron McElroy, Jr., to investigate the possibility of purchasing the stock of JGT.[1] On December 18, 1953, Price Construction Company authorized Ernest F. Smith to investigate the possible purchase of JGT's accounts receivable and of assuming certain potential tort liabilities. Smith made an investigation, discussing the possible tort liabilities of JGT with attorneys for various defendants, and reported to Price on January 15, 1954 that he believed the cases could be disposed of for a reasonable amount.

On January 27, 1954, Mrs. Turnbull, individually, and on behalf of the Estate of J. Gordon Turnbull, accepted an offer of B. C. McElroy and Cameron McElroy to purchase all of the outstanding shares of JGT for the sum of $975,000. Pursuant to this agreement, Henderson acquired all of the outstanding shares of JGT and the funds were provided by borrowing $25,000 from Cameron McElroy and H. R. Henderson, $801,108.37 from JGT, and by JGT redeeming stock in the sum of $148,891.63 as treasury shares, a total of $975,000, which was paid to Mrs. Turnbull and the Estate for the stock.

At the time, in fact from December 31, 1946 through April 15, 1958, the outstanding stock of Henderson was owned by H. R. Henderson, 32 per cent; Cameron McElroy, Jr., 48 per cent; B. C. McElroy, Sr., 10 per cent; and E. Key, III, 10 per cent.

On February 4, 1954, Price purchased the JGT accounts receivable of $420,526.98 by paying $50,000 cash plus a 90-day promissory note for $150,000 with interest at 4 per cent, a total of $200,000, plus assumption of any liability determined against JGT as the result

---

1. The stock was owned by the Estate of J. Gordon Turnbull and his widow, Mrs. Susan Turnbull.

of (1) a claim for damages pending in a federal court in Arkansas in the sum of $3,950; (2) a claim for damages in the amount of $38,250; and (3) a claim for damages growing out of an accident at the Reynolds Metals plant at Gregory, Texas, on November 15, 1951, in the aggregate amount of $532,895. The $50,000 cash paid to JGT was loaned to Price by H. R. Henderson and Cameron McElroy, each putting up the sum of $25,000.

The claims which Price assumed in the Gregory, Texas, accident on November 15, 1951 grew out of suits for damages for the death of a worker and the injury of seven others. JGT was the architectural engineer on the job and responsible for drawing the plans for the design of the entire plant but did not draw the plans for the silo on which the accident occurred and on which construction was being made at the time by a subcontractor. Sued with JGT were the joint venture general contractors, H. R. Henderson and Company and Henry C. Beck Company, as well as Reynolds Metals Company, the landowner. JGT had public liability insurance, and one of its insurance carriers paid $5,000 on its behalf on November 1, 1954 in full settlement of JGT's liability in all the claims. Nothing was ever paid by either JGT or Price to settle these claims.[2]

The suit in the federal court in Arkansas for $3,950 was dismissed for lack of prosecution on March 19, 1954.

After selling its accounts receivable to Price, JGT collected the amounts due on these accounts at various times from February 1954, month by month, to February 1955, a total of $469,608.34 which was transmitted to Price as received.[3] Price then made payments to JGT on its $150,000 note beginning in February 1954, with final payment in August 1954.[4] Thus Price had paid its promissory note obligation to JGT in full within six months of the execution of the note and the purchase of the accounts receivable.

The history of the ownership of the stock of Price is pertinent and shows that as of April 17, 1952 and until August 26, 1952, Cameron McElroy was owner of 49.83 per cent, with B. C. McElroy owner of .17 per cent, a total of 50 per cent, and the other 50 per cent was owned by W. R. Price, 49.83 per cent, and Marvin Pound, .17 per cent. On August 26, 1952, Cameron McElroy purchased the outstanding 50 per cent of the stock owned by W. R. Price and Marvin Pound, and on September 19, 1952, the Price stock was redistributed, with Cameron McElroy owning 49.83 per cent; B. C. McElroy, 9.67 per cent; H. R. Henderson, 28.50 per cent, and several other smaller holdings. Thereafter Cameron McElroy purchased the outstanding stock of a number of the smaller shareholders and the stock was redistributed again on December 1, 1953 so that Cameron McElroy owned 20 per cent; B. C. McElroy, 10 per cent; H. R.

2. More complete details of these suits are found in our opinion in the companion case of J. Gordon Turnbull, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, 373 F.2d 87, filed this day.

3. The total payments which JGT received and transmitted to Price are set forth as follows:

| Total Payments Received During | Amount |
| --- | --- |
| February 1954 | $ 85,976.37 |
| March 1954 | 82,480.12 |
| April 1954 | 49,202.68 |
| May 1954 | 60,500.27 |
| June 1954 | 115,449.45 |
| July 1954 | 3,077.61 |
| August 1954 | 24,400.00 |
| December 1954 | 2,690.75 |
| January 1955 | 2,500.00 |
| February 1955 | 43,331.09 |
| Total | $469,608.34 |

4. Price payments to JGT are detailed as follows:

| Date of Payment | Amount |
| --- | --- |
| February 17, 1954 | $50,000.00 |
| April 5, 1954 | 25,000.00 |
| April 28, 1954 | 25,000.00 |
| May 26, 1954 | 5,000.00 |
| June 7, 1954 | 15,000.00 |
| June 24, 1954 | 15,000.00 |
| July 2, 1954 | 10,000.00 |
| August 4, 1954 | 5,000.00 |
| Total | $150,000.00 |

Henderson, 28 per cent, with other shareholders. This percentage of ownership remained through February 4, 1954.

Also most pertinent to this case is the fact that Price had been in financial difficulties for several years and had substantial net operating losses of $100,450.-20, $41,319.73 and $108,818.13 for each of its three fiscal years ended April 30, 1951, 1952 and 1953, respectively. These losses were carried forward and offset against the JGT receivables collected and Price was able to realize this income entirely tax free. Price used these funds to repay previous advances made by Henderson to carry on its operations.

## TRANSFEREE LIABILITY

The Tax Court held that taxpayer was liable as transferee for deficiencies determined to be due from Henderson for 1954–1955. During those years Henderson filed a consolidated income tax return with its subsidiary, JGT. Under the Internal Revenue Code of 1954, when consolidated returns are filed, the affiliated companies consent to the applicable regulations as provided by Section 1502 (see Section 1.1502–12(b), Income Tax Regulations) and under the Regulations the common parent and each subsidiary are severally liable for the tax for the consolidated period, including any deficiency. See Section 1.1502–15(a). Thus Henderson, the parent corporation, in whose name the consolidated returns were filed, was liable for the entire amount of tax due, including any deficiency and the affiliated corporation (JGT) was similarly liable. Turnbull, Inc. (taxpayer) is the transferee of the assets of Henderson and assumed all of its debts and liabilities as a result of the statutory merger. The merger agreement provided (Article XI(d) (e)) that "all property, real, personal and mixed * * * shall be vested in the surviving corporation without further act or deed." And, "that all rights of creditors * * * shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations, including liability to dissenting shareholders, shall thenceforth *attach* to the Surviving Corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." (Emphasis supplied.) In our opinion the word "attach,' as used in this context, means that all liabilities of transferor are "assumed" by the transferee.

Turnbull, Inc., the surviving corporation, also executed a transferee agreement on Internal Revenue Service Form 2045 in consideration of the Commissioner not issuing a statutory notice of deficiency and making an assessment against transferor Henderson. In the transferee agreement Turnbull, Inc. specifically admitted it was the transferee of assets received from the transferor corporation (Henderson) and assumed and agreed to pay the federal income taxes for the years 1954, 1955 and 1956, in accordance with Section 6901.[5]

Thus Turnbull, Inc. is bound by contract by the merger agreement and also by the transferee agreement, neither of which it may now denounce as invalid, for it is as clear as words can make it that taxpayer assumed Henderson's liability and is estopped to contend otherwise. See Section 6901, Internal Revenue Code of 1954; Daugette v. Patterson, 5 Cir., 1957, 250 F.2d 753; R. H. Stearns

---

5. The transferee agreement on Form 2045 reads in pertinent part as follows:

"In consideration of the Commissioner of Internal Revenue not issuing a statutory notice of deficiency to and making an assessment against the above-named transferor corporation, the undersigned admits that it is the transferee of assets received from said transferor corporation, and assumes and agrees to pay the amount of any and all Federal income, excess-profits, or profits taxes finally determined or adjudged as due and payable by the above-named transferor corporation for the taxable year (or years) ended *1954, 1955 and 1956,* to the extent of its liability at law or in equity, as a transferee within the meaning of Section 6901 of the Internal Revenue Code of 1954 and corresponding provisions of prior internal revenue laws;"

Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934). See also Texsun Supply Corp. v. Commissioner, 17 T. C. 433 (1951); Kaufmann Dept. Stores, etc. v. Commissioner of Int. R., 3 Cir., 144 F.2d 776, affirming 2 T.C. 656 (1943).

## LIABILITY FOR INCOME TAX ON ACCOUNTS RECEIVABLE ASSIGNED TO PRICE

■■ We agree with the Tax Court that the principal purpose of the assignment by JGT of $420,000 of accounts receivable for a consideration of only $200,-000 was to avoid income tax that would be due upon their collection. There was no doubt about the collectibility of the accounts receivable. Cameron McElroy, Jr., B. C. McElroy, Sr. and H. R. Henderson controlled both the Henderson and Price corporations. It was to their interest to have these accounts assigned to a corporation (Price) with large net operating loss carryovers and thereby reduce the income of JGT to avoid the tax which would be due on their collection. This transparent transaction cannot be used to defeat the tax which is clearly due on the collection of these accounts. It was in no way an arms-length agreement and therefore invalid for tax purposes. The purchase by Henderson of all of JGT's stock and the assignment of JGT's receivables to Price were all part of one transaction. To argue otherwise is to ignore the obvious. From the proceeds of the receivables Price was able to pay its $150,000 note to Turnbull within six months after the assignment was made. The sale, therefore, of the receivables by JGT to Price was for a wholly inadequate consideration manipulated in order to defeat and avoid taxes justly due thereon which properly should be taxed to JGT rather than to Price. A taxpayer corporation which has earned the right to income to be paid in the future cannot escape the tax on those earnings merely by transferring the right to income to another corporation. Wood Harmon Corp. v. United States, 2 Cir., 1963, 311 F.2d 918. See also Helvering v. Eubank,

311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940); J. Ungar, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1957, 244 F. 2d 90.

The Tax Court's holding in this case is, therefore, in all respects

Affirmed.