GATOR OIL COMPANY (FORMERLY SANDERS-THOUREEN, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2494-74.    Filed April 26, 1976.

*Clausson Porter Lexow,* for the petitioner.
*William H. Newton III,* for the respondent.

STERRETT, *Judge:* The respondent determined a deficiency in Sanders-Thoureen, Inc.'s Federal income tax for the fiscal year ended November 30, 1969, in the amount of $35,511.30. In addition to the substantive issue which gives rise to the deficiency in controversy, this case also presents two procedural issues. These issues are whether petitioner, Gator Oil Co., is the transferee of Sanders-Thoureen, Inc., within the meaning of section 6901, I.R.C. 1954, as amended[1] thereby extending the statute of limitations for an additional 1-year period as provided by section 6901(c), and whether the respondent conducted a second examination of Sanders-Thoureen, Inc.'s books and records without the appropriate preliminary notification as required by section 7605(b). The substantive issue involves a determination of the fair market value of restricted stock of Titan Wells, Inc., that Sanders-Thoureen, Inc., received when it sold certain property to Titan Wells, Inc., in September 1969.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Sanders-Thoureen, Inc., was a corporation organized in 1959 and existed under the laws of Florida. Following the death of Sanders the corporation adopted a resolution in April 1971 to amend its bylaws to reflect a change in the corporation's name to Gator Oil Co. A certificate of amendment of the corporation's bylaws was filed with the State of Florida in May 1971 and was acknowledged by the State in June 1971. For convenience Gator Oil Co. (formerly Sanders-Thoureen, Inc.) will hereinafter be referred to as the petitioner.

Petitioner is a corporation, organized and existing under the laws of Florida with its place of business in Lake Worth, Fla., at the time of filing its petition herein. Petitioner filed its Federal income tax return (under the name of Sanders-Thoureen, Inc.) for the fiscal year ended November 30, 1969, on February 15, 1970.

Petitioner was the owner of certain oil-producing properties located in Kansas known as Sanders-Thoureen, Inc., Inge Block (hereinafter Inge Block). In 1969 petitioner offered in writing to sell its interest in these properties to Titan Wells, Inc. (hereinafter Titan), for $20,215.82 and 57,392 shares of Titan stock. In its offer petitioner noted that it was "accepting this stock as investment stock and we realize that it is subject to all the limitation rules and regulations of the Securities and Exchange Commission relative to investment stock."

Petitioner was later advised in a return letter from Titan's president that the stock it was to receive was nonregistered stock known as investment, lettered, or stamped stock which was not intended for immediate sale through normal market channels. Petitioner was also advised that the stock could be sold after approximately 2 years, or earlier if transferred to another individual subject to the same restrictions, if permission was received from the SEC, or if Titan were to be merged into a public interstate company.

In September 1969 petitioner's offer was accepted by Titan and the necessary documents were executed to effect the transaction. Petitioner received the above mentioned consideration

with the stock certificate bearing the following statement on its face:

This Certificate is issued in accordance with the exemption from registration provided by Section 4 (2) of the Securities Act of 1933, as amended. The registered owner takes this stock with a view towards investment and not with a view towards distribution. The transfer agent will not honor transfer instructions unless it receives instructions from the corporation through its counsel stating that any further transfers are made in accordance with applicable law.

After the transaction was concluded Titan and its subsidiary recorded the value of the 57,392 shares of Titan stock transferred to petitioner on their books at $3 per share. With respect to the stock's value Titan advised petitioner in September 1969 that the bid price for the stock during the period in which the parties were negotiating was approximately $3 per share. It was further indicated that in Titan's opinion, because of the restrictions placed on the certificate, a 50-percent discount would be appropriate. Petitioner reported the value of the Titan stock received on its books at $0.75 per share.

Titan, in November 1975, made the following statements to the respondent in response to his request for information with respect to Titan stock during 1968 and 1969:

1. There were no public offerings of Titan Wells, Inc. stock either during 1968 or 1969 or at any other time. Titan Wells Inc. *never* at any time sold stock to the general public.

2. Since no public sale was ever conducted, question 2 is not germane since there was no volume of public sales and any "bid and asked" prices which existed were only those quoted by the market makers among themselves.

3. There was no distribution of Titan Wells' stock during 1968 and 1969 or otherwise except for a limited number of private transactions. Any brokers who might have been involved in quoting Titan Wells' stock during this period did so at their pleasure and discretion, wandering in and out of the pink sheets as they saw fit without notification to us or any control over the matter being available to us.

[Emphasis in the original.]

The Inge Block consisted of oil and gas leases on approximately 1,800 acres of land in Kansas. Petitioner's interest in this property was limited to the oil leases and the amount of the oil reserves in place. In determining the quantity and value of these oil reserves petitioner relied primarily on the analysis of the property as done by Carl L. Pate (hereinafter Pate) and his associates at Oilfield Research Laboratories, Chanute, Kans.

Pate submitted a report to petitioner estimating the amount in barrels of the oil reserves in the Inge Block. His report contains core analysis, oil production, and oil reserve data on which his estimation is based. In a separate conversation Pate also advised petitioner with respect to the per barrel market value of the oil reserves in place. Petitioner then, through its president O. R. Thoureen (hereinafter Thoureen), analyzed and adjusted slightly Pate's figures to determine their selling price.

In November 1970 respondent through one of his agents, Roger D. Peele (hereinafter Peele), initiated a review of petitioner's tax return for the fiscal year ended November 30, 1969. Peele requested that he be allowed to examine, and he was thereafter furnished, petitioner's records which included the stock ledger, minute book, general ledger, and bank statements and cancelled checks for the period November 1968 through December 1969. Peele conducted his investigation and in December 1970 he issued a report (Form 4549 Income Tax Audit Changes) to petitioner which showed that no adjustments were recommended. This report had been subject to review by the District Director before the petitioner was notified of the respondent's position.

After issuing his report Peele still had some questions with respect to value reported by petitioner for the Titan stock received when it sold the Inge Block. Additional material was supplied to Peele which included the information petitioner had received from Titan. In February 1971 respondent sent to petitioner the following letter (Form L-250) which said in relevant part:

Return Form Number: 1120
Tax Periods Ended: 11/30/69
Revenue Agent: R. D. Peele

DEAR TAXPAYER:

A report on audit changes for the periods shown above was discussed and left with you by the revenue agent named. We have completed our review of the agent's report and have accepted it.

\* \* \*

Thank you for your cooperation.

Respondent subsequently learned, through an independent investigation by another District Office, that Titan had ascribed a $3 per share value for its stock and a payment of approximately $39,000 when it recorded its side of the transaction. Noting the discrepancies, Peele initiated a reopening memorandum (Form 4505) in which he estimated that, based on the higher figures, the addi-

tional tax could amount to approximately $37,000. This memorandum along with two factual memorandums were submitted to respondent's Southeast Regional Office. This office approved the District Office's request in June 1972 in a memorandum that said:

Subject: Reopening Memorandum

Re:
Sanders Thoureen, Inc.
P.O. Box 1031
Lake Worth, Fla. 33460
FYE 11-30-69

The request to reopen this case has been approved. A Form L-153, Notice of Reexamination was not requested and none is submitted. If it becomes necessary to reexamine the taxpayer's records, please obtain Form L-153 prior to any such additional inspection.

Respondent's administrative file does not reflect a retained copy of the Form L-153.

In June 1972 Peele sent petitioner a letter that began as follows:

Since closing the examination of your Federal income tax return for the year ended 11-30-69, additional information has come to our attention which will require the reopening of that years return in order to reconcile the differences between your books and the information received. It is hoped that this may be accomplished without going back to your books of account.

The letter went on to explain that the respondent had gathered new information with respect to the amount of the consideration received by petitioner on the sale of the Inge Block and without evidence to the contrary he would be forced to recompute petitioner's income tax using the higher figures. Peele estimated that the additional tax would be $40,852.63 and urged petitioner to contact him if it did not agree with his position.

On July 7, 1972, a meeting, attended by Thoureen, Lou Halter, Ralph G. Duxbury (hereinafter Duxbury), petitioner's accountant, and Internal Revenue Agent Leonard A. Gimpel (hereinafter Gimpel), was held in Duxbury's office.[2] To this meeting petitioner brought its general ledger, minute book, deposit slips, and other documents it had to support its valuation of the Titan stock and that it had only received $20,215.82. Gimpel examined these papers which were supplied to him voluntarily and took notes. Gimpel also requested that he be

---

[2] Lou Halter was petitioner's secretary and Gimpel had replaced Peele as the Internal Revenue Agent assigned to this case.

allowed to examine some canceled checks which were subsequently supplied.

After this meeting Gimpel prepared a transmittal report in which he proposed to increase petitioner's taxable income to reflect the receipt of approximately $39,000 and the increased valuation, to $3 per share, in lieu of the lower amounts previously reported by petitioner. On September 28, 1972, respondent sent petitioner a 30-day letter in which he proposed to assess a deficiency based on Gimpel's determination. The letter was addressed to Sanders-Thoureen, Inc.

In response to this letter, a second meeting was held in respondent's offices in West Palm Beach, Fla., on November 7, 1972. This meeting was attended by Thoureen, Duxbury, Gimpel, and Howard R. Harris (hereinafter Harris), a group supervisor in respondent's West Palm Beach office. At this meeting respondent accepted petitioner's position that it had received only $20,215.82, but no agreement was reached with respect to the valuation of the Titan stock.

Also at this meeting respondent presented two Internal Revenue Service forms for petitioner to sign. One was Form 977 Consent Fixing Period of Limitation On Assignment of Liability At Law Or In Equity For Income, Gift, Estate And Profits Tax Against A Transferee Or Fiduciary. The form provided:

Pursuant to existing internal revenue laws, Gator Oil Co., a transferee or fiduciary, of P.O. Box 1628 Lake Worth, Florida 33460, and the District Director of Internal Revenue, or Assistant Regional Commissioner (Appellate), hereby consent and agree as follows:

That the amount of the liability, at law or in equity, of Gator Oil Co. as transferee or fiduciary, in respect of any income, gift, estate, or profits taxes (including interest, additional amounts, and additions to the tax provided by law) imposed against or due from Sanders Thoureen, Inc., for the taxable year ended 11-30-69, under existing or prior revenue acts, may be assessed at any time on or before 11-30-73, except that if a notice of such liability is sent to said transferee or fiduciary by certified or registered mail on or before that date, the time for making any assessment as aforesaid shall be extended beyond that date by the number of days during which the making of an assessment is prohibited and for 60 days thereafter.

The other was Form 2045 Transferee Agreement which provided:

| *Transferor* | *Transferee* |
|---|---|
| Sanders Thoureen, Inc. | Gator Oil Co. |
| P.O. Box 1031 | P.O. Box 1628 |
| Lake Worth, Florida | Lake Worth, Florida |

*If Incorporated Show:*

| Date Incorporated | Date Incorporated |
| 1959 | 1971 |
| State in Which Incorporated | State in Which Incorporated |
| Florida | Florida |

In consideration of the Commissioner of Internal Revenue not issuing a statutory notice of deficiency to and making an assessment against the above-named transferor, the undersigned, as transferee of assets received from the above-named transferor, assumes and agrees to pay the amounts of any and all Federal income or profits taxes finally determined or adjudged as due and payable by such transferor for the taxable year(s) ended 11-30-69, to the extent of the liability at law or in equity as transferee within the meaning of section 6901 of the Internal Revenue Code of 1954 and corresponding provisions of prior internal revenue laws.

FURTHER: The undersigned agrees, in the absence of prior written consent of the Commissioner of Internal Revenue, not to sell, transfer, or assign without adequate consideration all or any substantial portion of its assets; and

FURTHER: The undersigned, if a corporation, has, by resolution of its board of directors, been authorized to enter into this agreement and there is attached a copy of the minutes of its board of directors evidencing the authorization and that the terms of this agreement have been included in its corporate minutes.

The handwritten printing on both the above forms was that of Gimpel. Both of these forms were signed in petitioner's behalf by Thoureen.

In May 1973 petitioner filed a protest with the respondent to the proposed adjustment. The protest referred to a purported reexamination of petitioner's books in November 1972 but made no reference to a purported reexamination in July 1972. It was not until respondent received "Petitioner's Answers to Respondent's Interrogatories" in December 1974 that respondent became aware that petitioner was alleging that a purported reexamination occurred in July 1972.[3]

The statutory notice was mailed to petitioner on January 18, 1974. The alleged deficiency is based on an increase of long-term

---

[3] We note however that petitioner in its petition which was filed with this Court in Apr. 1974 alleged:

4. The determination of tax set forth in said notice of deficiency is based on the following errors:

(a) The Commissioner erred by examining the books and records of Sanders-Thoureen, Inc. for the taxable year ended November 30, 1969 for a second time in violation of Section 7605(b) of the Internal Revenue Code of 1954 (hereinafter referred to as the Code).

(b) The Commissioner erred by improperly reopening a case previously closed by examination.

Respondent denied these allegations in his answer to this petition which was filed with this Court in June 1974.

capital gain realized by petitioner on the sale of the Inge Block caused by an increase in the value of the Titan stock from $0.75 to $3 per share. Respondent in his original and reply briefs has now determined that the value of the Titan stock as of September 1969 should be $1.25 per share.

OPINION

The substantive issue presented by the case at bar is a determination of the fair market value of the restricted Titan stock petitioner received when it sold the Inge Block to Titan in September 1969. However, before reaching the substantive merits of this case we must first deal with the procedural issues, either one of which could render the substantive issue moot. These two issues are whether petitioner, Gator Oil Co., is the transferee of Sanders-Thoureen, Inc., within the meaning of section 6901 and thereby subject to an extension of the statute of limitations for an additional 1-year period as provided by section 6901(c), and whether the respondent conducted a second examination of petitioner's books and records without the appropriate preliminary notification required by section 7605(b).

Under section 6901(a) a transferee of property is responsible for the tax liability of the transferor who incurred the liability. The same procedures that are applicable to the transferor apply to the assessment and collection of taxes from a transferee. This section authorizes the assessment and collection of a transferor's income tax liability from a transferee to the extent of the transferee's liability therefor either at law or in equity. *Benjamin Bellin,* 65 T.C. 676 (1975).

Section 6901 has been held to be solely procedural, thus requiring resort to applicable State law to determine the existence and extent of the transferee's liability. *Commissioner v. Stern,* 357 U.S. 39 (1958). Pursuant to the statute the burden of proof is on respondent to show that the petitioner is liable as a transferee of property, but not to show that the transferor was liable for the tax. Sec. 6902.

Petitioner was incorporated under the name Sanders-Thoureen, Inc., pursuant to the laws of Florida in 1959. Subsequently Sanders died and Thoureen decided to change the name of the company. Between April and June 1971 a resolution to amend the corporate bylaws to effect a change in the

corporation's name was adopted by the corporation and was submitted to and subsequently accepted by the State of Florida.

Presumably the above procedure was conducted under the provisions of the Florida corporation law which provides at FSA section 608.18: [4]

(1) Any corporation having capital stock may amend its certificate of incorporation *in any respect,* provided that only such provisions shall be inserted by amendment as would be lawful and proper in an original certificate of incorporation made at the time of making such amendment. Every amendment shall be approved by the board of directors, proposed by them to the stockholders and approved at a stockholders' meeting by such proportion, not less than a majority, of the stock entitled to vote thereon as may be provided in the certificate of incorporation. [Emphasis supplied.]

Upon consideration of this provision we do not believe that there ever existed two distinct corporate entities of which one was the transferee of the other. Rather, we believe that there has always been just one corporate entity that, through a simple amendment to its bylaws, merely changed its corporate name.

Our conclusion with respect to Florida law is supported by *Stewart v. Preston,* 86 So. 348 (Fla. 1920), in which a corporation was sued in its old name but made its entry of appearance in its new name. The court, in upholding this entry of appearance, said at 349:

The language used in the entry of appearance signifies merely a change of name of the defendant corporation, but no change of its identity. The change in the name of a corporation has no effect whatever upon its property, rights, or liabilities. It continues as before responsible in its new name for liabilities previously contracted or incurred, and has the right to sue on contracts made or liabilities incurred to it—before the change. After the change it should, by proper averments showing the change, sue and be sued by its new name. The change in the name of a corporation has no more effect upon its identity, as a corporation, than the change in the name of a natural person has upon his identity.

Consequently we do not believe that petitioner's liability for this deficiency, if any, is that of a transferee at law through the operation of State law.[5] Despite our foregoing conclusion we still must

---

[4] Effective Jan. 1, 1976, this section can now be found in FSA secs. 607.177 and 607.181. See especially sec. 607.177(1) and (2)(a).

[5] In sec. 301.6901-1(b), Proced. & Admin. Regs., a transferee is defined to include "the successor of a corporation, a party to a reorganization as defined in section 368, and all other classes of distributees."

Sec. 368(a)(1)(F) provides:

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

consider whether petitioner is liable as a transferee at law based on contract. See Newton, "Collection of Federal taxes by transferee liability; How it works; Who can be caught," 43 Journal of Taxation 112 (Aug. 1975).

It has been stipulated that Thoureen, as petitioner's president, executed on November 7, 1972, Form 2045 Transferee Agreement the relevant portions of which have been set out in our Findings of Fact. Respondent points out that it was petitioner's representations to him at the November 1972 meeting that caused him to use this form.

Respondent argues that as of November 1972 the standard 3-year statute of limitations had not expired and he still possessed statutory authority to issue a notice of deficiency. His forbearance then from issuing such notice against the transferor served as adequate consideration to bind the petitioner to its agreement and his reliance on the agreement estops the petitioner from denying its liability. For support respondent relies on *Turnbull, Inc.* (Supplemental Opinion), 42 T.C. 582 (1964), affd. 373 F. 2d 91 (5th Cir. 1967), cert. denied 389 U.S. 842 (1967), which was recently followed by this Court in *Benjamin Bellin, supra.*

We do not seek to disavow the holdings of these cases. However, upon consideration of the events that led to the November 1972 meeting and the testimony of those in attendance, we do not believe that either party intended that the transferee agreement should establish everything that the respondent now asserts or that the respondent could have properly relied on the agreement in the manner he now claims.

---

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—
\* \* \*
(F) a mere change in identity, form, or place of organization, however effected.
and sec. 368(b) provides:
(b) PARTY TO A REORGANIZATION.—For purposes of this part, the term "a party to a reorganization" includes—
(1) a corporation resulting from a reorganization \* \* \*

In its petition petitioner alleged in par. 5(f) that "Sanders-Thoureen, Inc. changed its name to Gator Oil Company under Section 368(a)(1)(F) of the Code, and accordingly is not a transferee"—an apparently damaging admission to petitioner's cause.

Respondent however in his answer said with respect to the above paragraph that he "denies the allegations of subparagraph (f) of paragraph 5 of the petition, except it is admitted that Sanders-Thoureen, Inc. changed its name to Gator Oil Company." Respondent has subsequently neither argued nor attempted to prove that a reorganization occurred or that petitioner was a party to it.

We believe that a review of the factual pattern of this case supports our conclusion.

Respondent's initial review of petitioner's tax return for the fiscal year in issue was concluded without adjustment in February 1971. Petitioner changed its corporate name between April and June 1971. Approximately 1 year later Peele sent petitioner the letter (addressed to Sanders-Thoureen, Inc.) in which he advised that he had received new information with respect to the Inge Block transaction. This letter led to the July 1972 meeting.[6]

This meeting was held in Duxbury's office and was attended by Thoureen, Duxbury, Lou Halter,[7] and Gimpel. The latter testified that the fact that petitioner had recently changed its name was not discussed at this meeting. Thoureen testified that, although this point was not specifically discussed, the fact of the name change was evident to everyone there. Duxbury testified that Gimpel was specifically advised of recent name change.

Based on these circumstances we are convinced that Gimpel was aware in July 1972 that petitioner had changed its name. Even if Duxbury's direct testimony is discounted we can only believe that Gimpel, after scheduling the meeting, conferring with three of petitioner's representatives, and examining petitioner's books, was aware that petitioner had changed its name. We note for the record that there is not the slightest indication that the petitioner attempted to conceal from or mislead the respondent with respect to any of the facts in this case. Nor does respondent so contend.

Although Gimpel, as we have found, was aware of the corporate name change it had no procedural significance to him. It is not mentioned in his notes of the meeting that were made part of this record or in his transmittal report that led to the 30-day letter that was subsequently issued. Further he did not discuss this aspect of the case with Harris prior to the November 1972 meeting. The foregoing facts compel the conclusion that Gimpel although aware of the corporate name change did not believe this case to be a transferee-transferor situation within the purview of section 6901.

---

[6] Although by this time petitioner had changed its name there is no indication in the record that the respondent had any problem reaching petitioner.

[7] Lou Halter did not testify at the trial.

The July 1972 meeting did not resolve the differences between petitioner and respondent. Subsequently respondent sent to petitioner (addressed to Sanders-Thoureen, Inc.) a 30-day letter advising petitioner of the adjustments he was proposing with respect to the Inge Block transaction. This letter led to the November 7, 1972, meeting.[8]

This meeting was held in respondent's West Palm Beach, Fla., office and was attended by Thoureen, Duxbury, Gimpel, and Harris. At this meeting respondent accepted petitioner's position with respect to the amount of cash received, but no agreement was reached with respect to the value of the Titan stock. Harris then presented to Thoureen Forms 977 and 2045 for his signature. After having had a chance to read these forms, to ask questions, and to confer with Duxbury, Thoureen voluntarily signed these forms in petitioner's behalf.

When Harris presented these forms to Thoureen he explained their significance as follows:

Q. * * * Would you tell the Court how you explained the, as a matter of practice, the significance of signing a Form 2045 to him.

A. In giving an explanation I would show him the 2045 which is the Transferee Agreement, and I would explain that since Gator Oil Company now has all the assets were formerly Sanders-Thoureen, that this form transfers the liability just the same as the assets had been previously transferred from one corporation to the other and that in case of any additional tax assessment that the government would follow from one corporation to the other.

Q. What did you explain to Mr. Thoureen with respect to the effect upon the statute of limitations?

A. I'm sure I explained to him that on an unagreed case that we wanted 120 days for proper consideration of the case, and that I was handing him this agreement form to extend the statute.

Q. Excuse me, Mr. Harris, I'm talking about the Transferee Agreement, the Form 2045, Exhibit 34HH, which I'm handing to you now. Now, what did you explain to Mr. Thoureen as to the effect of that form upon the statute of limitations with respect to his company?

A. I don't recall having explained anything to him about further extension.

Harris later testified that he was aware of the effect that Form 2045 had on the statute of limitations, but he apparently did not rely on that fact since he asked petitioner at the same time to sign the Form 977 which merely extended the statute of limitations to November 30, 1973. Harris and Gimpel both forthrightly indicated that it was their intention, through the use

---

[8] See n.6 supra.

of these forms, to extend the statute of limitations to November 30, 1973.

Harris also testified that his decision to use Forms 977 and 2045 in lieu of Form 872 was based on his interpretation of the statements made by petitioner to him that there had been a transfer of assets. Harris had neither examined petitioner's books nor had any other knowledge of the corporate name change transaction. Respondent's counsel did not, in his cross-examination of Thoureen and Duxbury, try to get them to be specific with respect to what they said to Harris about this matter at the November 1972 meeting.

After due consideration of the Form 2045 in the record and the facts that led to its execution, we believe, and find, that it was offered by respondent, and executed by petitioner, merely and exclusively as an acknowledgment that it (Gator Oil Co.) was responsible for the tax liability, if any, that had been incurred by the corporate entity. We further believe, and further find as a fact, that Form 977 was offered by respondent, and executed by petitioner, with the mutual intent that the statute of limitations with respect to the fiscal year under consideration was extended to November 30, 1973 (representing a year's extension from the date of its execution on November 7, 1972), and that this was the *only* extension of the statute intended to be effectuated by the parties on that occasion. The parties did not on that occasion intend to make operative the conflicting expiration date of the statute of limitations referred to on Form 2045.

We realize that the Form 2045, which is part of the record, is complete on its face. However, we believe in this case we may appropriately consider the other available evidence to determine the nature and extent of the agreement between the parties. See *Pentland v. Pentland,* 113 So. 2d 872 (Fla. 1959), cert. denied 119 So. 2d 295 (Fla. 1960); *Bessemer Properties v. Barber,* 105 So. 2d 895 (Fla. 1958); 9 Wigmore on Evidence, secs. 2415, 2417, and 2430, pp. 43, 58, 97 (3d ed. 1940). Having done that we believe respondent's attempt to attribute more significance to the Form 2045 than was actually intended must fail.

By this holding we do not intend to encourage prospective petitioners to repudiate the terms of documents freely executed by them after presentation by the respondent on the grounds that the documents were not adequately explained. We have found here that the documents utilized, with their conflicting effect on the extension of the statute of limitations, do not on their face represent the mutual agreement reached by the parties. Consequently we believe in this case it would be inappropriate to give the Form 2045 its usual legal effect. Cf. *P. Liedtka Trucking, Inc.,* 63 T.C. 547, 553 (1975).

Respondent has not shown that the petitioner is subject to transferee liability at law either based on contract or through the operation of State law and has neither argued nor attempted to prove that petitioner is liable in equity. Since petitioner has no liability as a transferee within the meaning of section 6901, the statute of limitations is not extended by the additional 1-year period as provided by section 6901(c).

The tax return in issue was filed by petitioner on February 15, 1970. The standard 3-year statute of limitations expired on February 15, 1973. Prior to that date petitioner and respondent agreed to extend the statute of limitations to November 30, 1973. Respondent did not mail his statutory notice of deficiency until January 18, 1974. Based on these facts and in accordance with our above opinion, we are left with no alternative but to hold that the statutory notice of deficiency is not timely and assessment of the deficiency determined therein is barred by the statute of limitations.

In view of this holding we believe it is unnecessary for us to discuss the other procedural issue raised by petitioner with respect to section 7605(b) or to make any determination with respect to the fair market value of the Titan stock received by petitioner on the sale of the Inge Block.

*Decision will be entered for the petitioner.*