HARDER SERVICES, INC. (FORMERLY: HARDER EXTERMINATION SERVICE, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1867–74. Filed December 27, 1976.

*John K. Antholis,* for the petitioner.
*Marian L. Westen* and *Theodore J. Kletnick,* for the respondent.

FAY, *Judge:* Respondent determined corporate income tax deficiencies against petitioner, as transferee of Harder Tree Service, Inc., for the taxable years and in the amounts as follows:

| TYE Dec. 31— | Deficiency | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 1964 | $1,399.99 | 1966 | $6.22 |
| 1965 | 1,252.50 | 1968 | 15,008.04 |

The principal issue for decision is whether all or any portion of the sum of $100,677.44 paid by Harder Tree Service, Inc., in 1967 for the repurchase of certain of its outstanding shares is deductible in connection with the termination of business of a subsidiary in 1967. The deficiencies determined for the years 1964, 1965, 1966, and 1968 were based solely upon adjustments in the allowable net operating loss carrybacks and carryforward resulting from the disallowance of the deduction claimed in 1967. In the event that respondent's determinations as to this issue are sustained, we must then address a second issue as to whether petitioner may be held liable, as transferee, for the tax deficiencies of Harder Tree Service, Inc.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference.

Petitioner Harder Services, Inc. (formerly Harder Extermination Service, Inc.), was incorporated in the State of New York in 1932. At the time of the filing of the petition herein its principal office was located in Hempstead, N.Y.

Harder Tree Service, Inc. (hereinafter sometimes referred to as Harder Tree) was incorporated in the State of New York in 1957. It filed corporate income tax returns on Form 1120 for each of the years 1964 through 1968.

Petitioner and Harder Tree were controlled by F. Kenneth Harder and his wife, and were engaged in the pest control business. Frank Harder, the son of F. Kenneth Harder, was also active in these businesses, having served as president of petitioner and an officer and director of Harder Tree.[1] Over the years since the founding of petitioner in 1932, additional corporations were acquired or established by the Harder family to engage in related businesses, including Harder Jersey Pest Control, Inc., and Harder-Woodland Tree Experts Co., Inc.

In 1964 the Harders began to consider the acquisition of an office maintenance and cleaning company. They believed that such an acquisition would complement their pest control operations and put them in a better position to compete with larger companies which offered pest control services as part of, or in addition to, their normal office cleaning services. In a discussion between Mr. Harder and Frank it was suggested that one possible acquisition might be Cardinal Maintenance Corp., the firm which had the cleaning contract on the Harder offices. The owner of Cardinal Maintenance Corp. was Philip A. Rogers, whom the Harders had known for many years. Rogers was the brother-in-law of Richard Valentine, an attorney whom the Harders had known since he was a child.

Frank then broached the subject to Rogers, who was receptive to the idea of his company becoming part of the Harder organization. Eventually the details of a possible merger transaction were discussed by Frank, Rogers, and Valentine, and documents were prepared by Valentine. Since Valentine had in the past served as attorney for both Rogers and the Harders in other matters, he was the only attorney involved in the merger planning, and he purported to represent both sides in the proposed merger transaction. Mr. Harder did not concern himself with the details of the transaction which he left up to Valentine. Valentine prepared the documents for the transaction and presented them to the Harders for review on July 23, 1964. The documents were reviewed by Mr. Harder and Frank and by another officer of the Harder companies, as well as the Harder's outside

---

[1] For convenience hereinafter F. Kenneth Harder will be referred to as Mr. Harder and Frank Harder will be referred to as Frank.

accountant. On July 31, 1964, a closing was held, attended by Mr. Harder, Frank, their accountant, Rogers, and Valentine. At the closing Valentine reviewed the agreement of merger with all of the persons attending.

The relevant provisions of the merger plan executed July 31, 1964, may be summarized as follows: Rogers' company, Cardinal Maintenance Corp., was merged into Harder Tree Service, Inc., and the stock of Cardinal Maintenance Corp. was canceled. Twenty-two shares of Harder Tree common stock were issued to Rogers, representing 11 percent of the total of 200 Harder Tree shares outstanding. The balance of such outstanding shares was owned by the Harders. Concurrently, Harder Tree created a new wholly owned subsidiary named Cardinal Maintenance, Inc.[2] The assets and business acquired by Harder Tree in the merger were contributed as capital to the newly created subsidiary.

At the time of the merger closing Harder Tree entered into an employment contract with Rogers, at a minimum salary of $1,000 per month; he was to give his best effort and skill exclusively to the business and interests of Harder Tree and its affiliates; he was to be precluded from competing with Harder Tree's or Cardinal's business for 5 years after he terminated his employment; and he was to be precluded from divulging trade secrets during his employment and for 5 years after termination of his employment. Either party had the right to cancel and terminate the employment upon 2 weeks' notice to the other party. Rogers was also elected a director and vice president of Harder Tree.

As an integral part of the merger transaction there was also executed a "Stock Option Agreement" between Harder Tree Service, Inc., F. Kenneth Harder, and Philip A. Rogers. Among other things, that agreement provided a grant to Harder Tree of an option to purchase any or all of the shares of stock of Harder Tree owned by Rogers for a period of 6 months commencing with the date of termination of Rogers' employment with Harder Tree for any reason. Harder Tree granted to Rogers, or his trustees, an option to sell to Harder

---

[2] Hereinafter sometimes referred to as Cardinal. This newly created subsidiary of Harder Tree is to be distinguished in name from Rogers' former company, Cardinal Maintenance Corp. (hereinafter sometimes referred to as Old Cardinal), which was merged into Harder Tree.

Tree all or any part of the shares of stock of Harder Tree owned by Rogers for a period of 6 months commencing on the date of Rogers' death; for a period of 6 months commencing with the date of termination of Rogers' employment with Harder Tree for any reason other than death, or his resignation as an employee of Harder Tree; or for a period of 6 months from the date of Rogers' resignation because Rogers' annual rate of salary, excluding bonuses, in the 2 calendar years immediately preceding the date of his resignation was below $12,000. The option price to be paid by Harder Tree in the event that Harder Tree or Rogers exercised their options was an amount determined by: .

(a) Multiplying the value of all the outstanding stock of Harder Tree by a fraction of which the numerator is the number of shares being sold and the denominator is the total number of shares of Harder Tree outstanding.

(b) The value of all the outstanding stock of Harder Tree was to be an amount equal to the average annual gross receipts of Harder Tree and all of its subsidiaries on a consolidated basis for 24 calendar months ending on the last day of the calendar month immediately preceding the month in which the right to exercise arose, except that if the right to exercise arose prior to August 1, 1967, such value was to be an amount equal to such annual gross receipts for 12 calendar months.

For the first 2 years following the merger transaction Cardinal failed to operate profitably, although realizing substantial gross sales. For the calendar year 1966, Cardinal had sales of $541,139.58 and its parent, Harder Tree, had sales of $374,109.85.

During 1966 the Harders' accountant, Keith Baker, recommended to Mr. Harder that all of the several Harder companies be merged into a single entity for administrative and accounting reasons and for possible financial and tax benefits. In the course of analyzing the feasibility of such a combination, Baker had occasion to review the employment and option agreements executed in 1964 between Harder Tree and Rogers. In November 1966 Baker sent a memorandum to Mr. Harder expressing the opinion that if the desired merger of the Harder companies were to be accomplished the Rogers'

stock option agreement must be canceled and a new agreement negotiated, for the following reasons:

(1) In a merger, Harder Tree would be dissolved and no longer be a party to the agreement.

(2) The consolidated sales of Harder Tree and Cardinal would become commingled with the sales of the other Harder companies, thus rendering inoperable the method prescribed for the valuation of stock under the option agreement.

(3) Rogers would become the owner of stock of the merged company, thereby acquiring an interest in the assets and profits of all five of the Harder companies, rather than just his interest in the operations of Harder Tree and Cardinal.

(4) The valuation method prescribed in the option agreement was improper since it is based upon *gross sales*, presumably upon the original assumption that such sales would yield normal rates of profit, increasing as sales increase, whereas in the case of Cardinal no net profits had been realized after more than 2 years of operations.

(5) The continued existence of the option agreement would probably foreclose the newly merged company from obtaining major debt or equity financing.

At this point for the first time Mr. Harder and Frank realized the significance of the valuation method prescribed in the 1964 Rogers' option agreement. Although they had both reviewed the agreement prior to its execution, they had failed to realize that an option price formula based upon gross sales without regard to net income might result in a price totally unrelated to the true value of the stock. In reviewing the 1964 merger documents, the Harders had relied heavily upon their confidence in Valentine, the trusted attorney and friend of both parties to the agreement.

After receiving Baker's memorandum concerning the Rogers' stock option agreement, and in light of the fact that the Cardinal operation, managed by Rogers, was not profitable, Mr. Harder determined that it would be necessary to terminate the relationship with Rogers. Although the 1964 employment agreement provided for termination by either party, the stock option agreement provided that if Rogers' employment were to be terminated by Harder Tree, Rogers could force Harder Tree to repurchase his 22 shares of Harder Tree stock at a price determined by the formula keyed to

gross sales. If Rogers were to be dismissed at the end of 1966, the repurchase price under the formula would be $100,677.44, an amount which the Harders considered totally unrelated to the true value of Rogers' 22 shares.

At this point Mr. Harder retained Alfred A. Marra, an attorney, to advise him with respect to the Rogers' situation. Marra reviewed the entire history of the 1964 transaction and formed an opinion that the stock option agreement should be abrogated on the basis that Valentine should not have represented both sides of the transaction and that the valuation formula under the agreement drafted by Valentine was unconscionable since it was based on gross sales and not on net earnings. Marra recommended in the strongest terms that the Harders take the matter to the courts and seek to have the agreement voided. Mark Wood, treasurer of Harder Tree, also had reservations about the formula and thought that the formula price for the stock was completely out of line with its true value. He brought this matter to the attention of, and discussed it with, Mr. Harder and Frank.

However, because of the involvement of Valentine, who had been a long-time friend of the Harders and who was Rogers' brother-in-law, the Harders did not wish to litigate the matter. Among other considerations they felt that the Valentine family was too wealthy and powerful to take on in a court battle and that such litigation might ultimately be harmful to their business. Accordingly, the Harders decided to resolve the matter by simply paying Rogers the $100,677.44 formula repurchase price for his stock, although they believed such price to be considerably in excess of the true value of such stock.

Thus, in January 1967, Harder Tree formally terminated the employment of Rogers and exercised its option to purchase his stock. In February 1967, Harder Tree paid Rogers $100,677.44, Rogers delivered his 22 shares to Harder Tree, and Rogers was removed as an officer and director of both Harder Tree and Cardinal.

In September 1967 the Harders took steps to sell the business and the assets of Cardinal, and in December 1967, Cardinal was formally dissolved.

In December 1968 all of the remaining Harder companies, including Harder Tree, were merged into Harder Extermina-

tion Services, Inc., the petitioner herein. The name of the surviving corporation was changed to Harder Services, Inc.

In connection with this merger all of the participating corporations executed a "Joint Agreement of Merger and Certificate" which contains the following language pertinent herein:

all rights of creditors and all liens upon the property of any of said corporations, parties hereto, shall be preserved unimpaired, and all debts, liabilities and duties of * * * HARDER TREE SERVICE, INC. shall thenceforth attach to the said surviving HARDER EXTERMINATION SERVICE, INC., and may be enforced against it to the same extent as if debts, liabilities and duties had been incurred or contracted by it.

The $100,677.44 paid by Harder Tree to Rogers in 1967 was treated on the books of Harder Tree as an additional investment in its subsidiary, Cardinal, bringing its total basis in its Cardinal investment to $103,520.60. In its income tax return for 1967 Harder Tree claimed the following deduction in connection with the dissolution of Cardinal:

| | |
|---|---:|
| Loss on investment in and advances to Cardinal Maintenance, Inc.—a wholly owned subsidiary dissolved in 1967 | $110,563.30 |

This amount claimed was computed as follows:

| | |
|---|---:|
| Total amount treated as capital contributions to Cardinal (i.e., basis of investment) | $103,520.60 |
| Uncollectible liability from Cardinal to Harder Tree | 7,042.70 |
| Total | 110,563.30 |

Harder Tree's 1967 return reported a net loss of $108,670.13, taking into account the above-mentioned deduction of $110,563.30 with respect to Cardinal. This net loss was then applied as a net operating loss carryback and carryforward to reduce the net income of Harder Tree (and its successor) for the years 1964 through 1966 and 1968 through 1972. Respondent has adjusted the reported 1967 net loss and resulting carryover and carryback deductions for 1964 through 1966 and 1968 to the extent of $100,677.44, the portion of the written-off investment in Cardinal representing the payment to Rogers in January 1967.

OPINION

The central issue in this case is the proper treatment for tax purposes of the $100,677.44 paid by Harder Tree to Rogers in 1967. Respondent contends that the payment was simply a purchase by Harder Tree of 22 shares of its outstanding stock from Rogers, and that under the well-settled rule of Internal Revenue Code section 311(a)[3] such a repurchase is a capital transaction giving rise to no deductible loss. Sec. 1.311–1(a), Income Tax Regs.; Rev. Rul. 55–462, 1955–2 C.B. 221.

Petitioner, on the other hand, asserts that the purpose of the $100,677.44 payment to Rogers was not really to repurchase his shares (which were allegedly worth only a fraction of that amount), but to terminate the Rogers' stock option agreement, which represented an onerous ongoing contingency adversely affecting Harder Tree's business. Thus, petitioner contends, in substance the payment represented an ordinary and necessary business expense deductible under section 162. Alternatively, petitioner contends that to the extent that the amount paid exceeded the fair market value of the stock reacquired, such excess is deductible as additional compensation for services or termination pay to Rogers.[4]

The issue of the deductibility of a stock repurchase as an ordinary and necessary business expense under section 162 has been considered in several cases. In *Capitol Indemnity Ins. Co. v. Commissioner*, 237 F.2d 901 (7th Cir. 1956), revg. 25 T.C. 147 (1955), the taxpayer, an insurance company, was a party to an onerous agency contract which threatened the survival of its business. As a part of an agreement for the cancellation

---

[3] Unless otherwise indicated, all section references herein are to the Internal Revenue Code of 1954, as amended.

[4] In the preparation of its 1967 income tax return Harder Tree treated the payment to Rogers as in substance an additional investment in its Cardinal subsidiary, having the effect of increasing its tax basis in Cardinal. The stock in Cardinal, at its increased basis, was then written off under sec. 165(g) as worthless in that same year. As its "primary position" on brief, petitioner contends that, although in form the Rogers payment appears to be a repurchase of stock, in substance it represented a delayed cash payment, in lieu of the 22 shares of Harder Tree, for the acquisition of the Cardinal assets and business from Rogers more than 2 years earlier. The only merit which we can find in this totally theoretical reconstruction of the transaction (which theory is inconsistent with petitioner's own evidence in support of the deduction under sec. 162) is that it dutifully attempts to support the approach originally taken in the tax return.

of this contract, the taxpayer agreed to make payments to certain of its founding stockholders. These payments (which apparently did not involve reacquisition of the shares of the stockholder-recipients) were held not to be dividends, but deductible as ordinary and necessary business expenses.

In *Five Star Manufacturing Co. v. Commissioner*, 355 F.2d 724 (5th Cir. 1966), revg. and remanding 40 T.C. 379 (1963), Kincade and Smith were equal coowners of the taxpayer corporation. The survival of the corporation was dependent upon the continuance of a certain patent licensing agreement. After Smith became heavily indebted to the corporation and the corporation indebted to the patent owner, litigation ensued. The owner of the patent refused to continue the licensing agreement with the taxpayer as long as Smith remained a coowner. Eventually Smith's stock in the corporation was put up for judicial sale, and the corporation, as the only bidder, repurchased the stock to eliminate Smith's interest. The entire purchase price was claimed as a deductible expense under section 162. The Court stated, in allowing the deduction,

It can scarcely be held that the payment to Smith was for the acquisition of a capital asset, but rather one which would permit Five Star again to use assets for income production by freeing its management from unwarranted fetters. [355 F.2d at 727.]

See also *United States v. Smith*, 418 F.2d 589 (5th Cir. 1969).

In *H. & G. Industries, Inc. v. Commissioner*, 495 F.2d 653 (3d Cir. 1974), affg. 60 T.C. 163 (1973), the taxpayer had issued certain convertible preferred stock which provided for an 8-percent dividend and a 12½-percent additional participation in annual net profits. It also imposed certain restrictions on the taxpayer's future financial activities. Four years later the taxpayer exercised its call privilege and redeemed the preferred stock, paying a call premium of $20 per share (20 percent). Taxpayer claimed the aggregate amount of the call premium as a section 162 deduction on the theory that the dividend and profit participation and other restrictive provisions of the preferred stock had become an onerous burden on the corporation, and that the call premium necessary to redeem the stock was an ordinary and necessary expense to relieve this ongoing burden. Taxpayer relied heavily upon *Five Star Manufacturing Co. v. Commissioner, supra,* and

other cases permitting deduction for payments to be relieved of onerous business contracts. The court, however, in *H. & G. Industries* distinguished *Five Star Manufacturing,* holding that the redemption of the preferred stock was merely a refinancing transaction by a financially healthy corporation and was not, as in *Five Star,* necessary to the survival of the corporation. The court specifically stopped short of holding, as respondent herein urges us to hold, that section 311 is an absolute bar to a section 162 deduction when stock is redeemed to avoid an allegedly onerous contract.

A recent case closely analogous to the instant case is *Jim Walter Corp. v. United States,* 498 F.2d 631 (5th Cir. 1974). Here the taxpayer corporation repurchased certain of its own outstanding warrants, which warrants, if not repurchased, would have entitled the holders to purchase either stock of the corporation or a combination of stock and bonds. The taxpayer sought to deduct the total warrant repurchase cost on the theory that the purpose of the repurchase was to avoid the potential future expense of bond interest should bonds have to be issued upon future exercise of the warrants. In analyzing the taxpayer's position, the Court began with the following principle of *United States v. Gilmore,* 372 U.S. 39 (1963):

the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether or not it is deductible * * *

The court then went on to hold that the origin and nature of the warrant repurchase was a nondeductible capital transaction because (1) the transaction was effected in connection with, and in order to facilitate, a public offering of new securities of the taxpayer, and thus was in the nature of a recapitalization expense, and (2) since the corporation could have issued stock in lieu of bonds upon the exercise of the warrants, the retirement of the warrants was really an extinguishment of stock rights, also a capital transaction. The cases of *Five Star* and *Smith,* relied upon by the taxpayer, were held not to establish a general principle that a primary business purpose can convert into a deductible expense an expenditure which is a capital transaction in nature and origin. *Estate of Meade v. Commissioner,* 489 F.2d 161 (5th Cir.

1974), revg. a Memorandum Opinion of this Court, cert. denied 419 U.S. 882 (1974). *Five Star* and *Smith* (both also Fifth Circuit cases) were limited to their specific factual circumstances, in which the payments were made to save the businesses of the respective taxpayers.

Application of the principles emerging from the foregoing cases to the facts of the Harder Tree situation, we believe, requires us to reject petitioner's theory for the deductibility of the $100,677.44 paid to Rogers. Petitioner contends that the repurchase of Rogers' stock was made "in order to insure the continued operation of the taxpayer's business" and, therefore, the case falls within the holdings of *Five Star* and *Capitol Indemnity Insurance, supra.* We cannot accept this argument. To begin with, we believe that the authoritative weight of these cases has been substantially diluted by such subsequent cases as *H. & G. Industries* and *Jim Walter Corp.*, which clearly confine the theoretical basis for the section 162 deduction to certain narrow factual situations of business survival. The facts in the instant case are not comparable to those in the cases relied upon. The continued presence of Rogers in the Harder enterprises was the result of a bad bargain which could be undone only at considerable expense. However, petitioner has not demonstrated that the continuance of Harder Tree's contingent obligation to repurchase Rogers' stock was a threat to the very survival of Harder Tree.[5] The elimination of Rogers' interest in Harder Tree (and in the future combined Harder companies) was not dictated by outside forces directly threatening Harder Tree's pest control business (as was the case in *Capitol Indemnity Insurance* and *Five Star*), but was motivated by the financial and corporate planning considerations of its majority owners.

Petitioner contends, alternatively, that to the extent that the amount paid to Rogers exceeds the fair market value of the stock transferred, such excess should be deemed additional compensation or termination pay. This argument is grounded on the theory that the principal motivation for the payment was the business necessity to terminate Rogers'

---

[5] The fact that Harder Tree was able to and did pay Rogers over $100,000 in cash, despite the advice of Mr. Harder's attorney to disclaim its obligation to do so, itself seriously undermines any argument that Rogers' potential right to force such a payment in the future constituted a threat to Harder Tree's survival.

employment, which termination triggered Harder Tree's obligation to repurchase his stock at the inflated formula price. We do not believe that this view of things is supported by the facts. While it appears that the Cardinal operation, which was Rogers' primary responsibility, was not profitable, Mr. Harder's solution to this problem was not to fire Rogers and replace him with another manager, but to get rid of the Cardinal operation altogether. Thus, the "pay-off" of Rogers does not appear comparable to the typical termination pay granted in connection with the replacement of an employee in an ongoing business.

Given the factual background here, the payment to Rogers in connection with the termination of his employment with the Harder enterprises cannot be separated from the contemporaneous elimination of his equity interest in Harder Tree (and his prospective future interest in the combined Harder companies). In this connection it should be noted that there is nothing in the record to indicate that Rogers would have been paid anything with respect to the termination of his employment had he wished to retain his 22 shares of Harder Tree thereafter. To the contrary, the record (most significantly, the memorandum to Mr. Harder from his accountant concerning the future merger of the Harder companies) indicates that the principal motivation for the payment to Rogers was to eliminate his minority position in Harder Tree and thereby facilitate the merger of the various Harder companies.

It is true, as it was in the cases of *H. & G. Industries* and *Jim Walter Corp.*, that the payment in the instant case was part of an arrangement which would relieve the corporation of an onerous contractual commitment. However, also as in those cases, the origin and nature of the payment was a capital transaction. *United States v. Gilmore, supra.* It appears from the facts, as we see them, that the principal reasons motivating the purchase of Rogers' stock were (1) to permit Harder Tree to be merged with the other Harder companies without having to give Rogers an interest in the merged entity by virtue of his 11-percent interest in Harder Tree, and (2) to eliminate Rogers' right to force the company to repurchase his stock in the future at ever increasing prices unrelated to the value of such stock, due to the faulty repurchase price formula. Essentially, the nature and purpose

of the payment to Rogers was to eliminate his present and future interest in the Harder enterprises. Despite the unusual surrounding factual circumstances, this amounted to a capital transaction. *Jim Walter Corp. v. United States, supra.*

Accordingly, we hold that no portion of the sum of $100,677.44 paid to Rogers in 1967 represented an ordinary and necessary business expense under section 162. Such payment represented a capital transaction giving rise to no taxable gain or loss. Sec. 311(a). *Jim Walter Corp. v. United States, supra; H. & G. Industries, Inc. v. Commissioner, supra.*

Having so held, we now turn to the question of petitioner's liability under section 6901, as transferee, for the tax deficiencies of Harder Tree.

In December 1968 Harder Tree (along with Harder Jersey Pest Control, Inc., and Harder-Woodland Tree Experts Co., Inc.) was merged into petitioner, pursuant to the laws of the State of New York. In the "Joint Agreement of Merger and Certificate" executed by the merging parties, there is contained a provision, quoted in our Findings of Fact, which clearly and unequivocally provides for the assumption by petitioner, as the surviving corporation, of all liabilities of the merged corporations, including Harder Tree.

Where a statutory merger has occurred in which the transferee, as the surviving corporation, expressly or impliedly[6] agrees to assume the liabilities of the merged corporation, the survivor is liable as a transferee at law, for the income tax liability of the merged corporation for periods prior to the transfer. See *Texsun Supply Corp.,* 17 T.C. 433 (1951); *Kaufmann Department Stores Securities Corp.,* 2 T.C. 656 (1943), affd. 144 F.2d 776 (3d Cir. 1944).[7] Nevertheless, petitioner maintains that respondent is required to establish that the value of the assets transferred is sufficient to satisfy the proposed deficiencies.

Section 6902(a) provides that in proceedings before this Court the burden of proof is on the respondent to show that a petitioner is liable as a transferee of property of a taxpayer.

---

[6] The operation of State law may imply such an agreement. See *Gator Oil Co.,* 66 T.C. 145, 158 (1976); McKinney, Business Corporation Law, sec. 906(b)(3), p. 58.

[7] See also *Turnbull, Inc.,* T.C. Memo. 1963–335, and Supplemental Opinion, 42 T.C. 582 (1964), affd. 373 F.2d 91 (5th Cir. 1967), cert. denied 389 U.S. 842 (1967).

In cases involving transferee liability at law as opposed to transferee liability in equity, however, it is unnecessary for respondent to establish the value of assets transferred to sustain his burden of proof. See *American Equitable Assur. Co. of New York v. Helvering,* 68 F.2d 46 (2d Cir. 1933), affg. 27 B.T.A. 247 (1932); *Kamen Soap Products Co. v. Commissioner,* 230 F.2d 565 (2d Cir. 1956), affg. a Memorandum Opinion of this Court;[8] compare *Elaine Yagoda,* 39 T.C. 170 (1962), affd. 331 F.2d 485 (2d Cir. 1964), cert. denied 379 U.S. 842 (1964).

Therefore, we conclude that such burden has been satisfied by respondent in this case merely through the documents reflecting the merger of Harder Tree into petitioner and its assumption therein of Harder Tree's liabilities.

Other than to allege that respondent has not met his burden of proof, petitioner has made no arguments to refute the seemingly clear authority of the above-cited cases. Accordingly, we hold that petitioner is liable, as transferee, for the income tax deficiencies of Harder Tree.

*Decision will be entered for the respondent.*

---

[8] See also *Turnbull, Inc., supra; Bos Lines, Inc.,* T.C. Memo. 1965–71, affd. 354 F.2d 830 (8th Cir. 1965); 9 Mertens, Law of Federal Income Taxation, sec. 53.08, ch. 53, p. 15 (1971).