P. Liedtka Trucking, Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 1882-73.    Filed February 12, 1975.

*Morton Deitz,* for the petitioner.
*Kenneth G. Gordon,* for the respondent.

Sterrett, *Judge:* The respondent determined deficiencies in petitioner's income tax for the calendar years as follows:

| Year | Deficiency |
|------|-----------|
| 1969 | $5,218.74 |
| 1970 | 6,171.20 |
| 1971 | 15,691.63 |

Of the several issues raised by the respondent only two, both arising from the same factual circumstances, remain for our determination.

The first issue is whether the transaction by which the petitioner acquired Interstate Commerce Commission motor carrier operating rights at a sealed bid sale held by the respondent was transformed into a leasing arrangement as a result of a subsequent agreement executed by the parties before the sale became final. The second issue is whether legal expenses incurred in connection with the acquisition of the above operating rights qualify as an ordinary and necessary expense under section 162, I.R.C. 1954,[1] or whether said expenses must be capitalized and included in the acquisition cost of the above operating rights.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

### FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

P. Liedtka Trucking, Inc. (hereinafter petitioner), is a corporation, organized under the laws of New Jersey with its place of business in Trenton, N.J., at the time of the filing of its petition herein. Petitioner, for the taxable years in issue, filed its Federal income tax returns with the Mid-Atlantic Service Center, Philadelphia, Pa.

Petitioner is engaged in the general trucking business in interstate commerce. Its operations are managed by Philip Liedtka (hereinafter Liedtka) who is petitioner's president and principal shareholder. Liedtka has been engaged in the general trucking business for approximately 23 years, the last 8 of which have been as president of petitioner. In this position Liedtka has become familiar with the rules and regulations of the Interstate Commerce Commission (hereinafter ICC) as they relate to motor carriers.

In February 1969 respondent advertised a notice of a sealed bid sale of an ICC Certificate of Public Convenience and Necessity No. MC-56210 of Prospect Trucking Co., Inc., of Trenton, N.J. This certificate authorized the owner to use several routes between various points in New York, New Jersey, and Pennsylvania. This certificate had been seized by the respondent for nonpayment of delinquent internal revenue taxes due from Prospect pursuant to section 6331 and was being sold pursuant to section 6335. The sale was conditioned on approval by the ICC of the transfer of the certificate from Prospect to the successful bidder.

The sale was held on March 10, 1969. Petitioner's bid of $52,500, for a portion of the rights encompassed by the certificate, was determined to be the highest and the operating rights were awarded to it. The next day petitioner placed in escrow the purchase price with the respondent, pending final approval by the ICC. In return respondent issued to petitioner a certificate of sale of seized property subject to subsequent approval by the ICC of the transfer of the rights to petitioner's name.

Following this transaction petitioner presented the certificate of sale to its attorney to apply to the ICC for temporary authority

to use the routes pending final approval of the transfer. In May 1969 the application was made and a 6-month authority was granted to petitioner.[2] At this time application was also made to the ICC for permanent transfer of the rights to petitioner's name. Upon receipt of the temporary authority petitioner began to utilize the routes purchased in March.

As part of its application for temporary authority petitioner stated: "There is no lease agreement in this transaction because the lessee will have no obligation to reimburse the Internal Revenue Service for temporary operations conducted under terms of the certificate of sale of seized property." In granting the temporary authority the ICC ordered: "That the said application * * * is hereby, granted * * * upon terms and conditions mutually agreeable to the parties [petitioner and Prospect in whose name the operating rights were still formally held] but at a total rental not exceeding $1 per month." [3]

In the beginning of 1970 petitioner became concerned with the status of its unopposed application before the ICC.[4] Petitioner had purchased additional equipment to service these new routes and its new customers were inquiring when petitioner could provide permanent service. Additional expansion plans were delayed pending final determination of its application. Reflecting this concern petitioner, through its attorney, had negotiations with respondent to develop actions that could be taken to enhance petitioner's application.

As a result of these negotiations the petitioner and respondent entered into a written agreement entitled "Lease Agreement" [5] (hereinafter agreement) in May 1970. The agreement was subsequently forwarded to the ICC.

The relevant portions of the agreement are as follows:

1. The District Director hereby leases to Liedtka and Liedtka hereby leases from the District Director Certificate of Public Convenience and Necessity No. MC-56210 issued to Prospect Trucking Co., Inc. by the Commission.

[2] In October 1969 this authority was extended indefinitely pending final determination of petitioner's application for transfer.

[3] In the order granting temporary authority to operate the petitioner and Prospect are referred to as lessee and lessor respectively.

[4] Earlier, respondent at petitioner's request had written the ICC reciting the factual circumstances and requested the ICC to expedite its deliberations and grant its approval of petitioner's application.

[5] The terms "lease," "lessee," "lessor," and "rent," as used in the Findings of Fact, are not intended to reflect a prejudgment of the character of the transactions in question, but instead are used solely for purposes of clarity and convenience.

2. If this lease is approved and authorized, Liedtka agrees to pay as rental no less than $250.00 per month but no more than 5% per month of monthly gross revenue whichever is the greater, earned under these rights during the term of this lease, which shall be for 180 days from the date of its approval by the Commission and for such additional time as may be authorized by said Commission, but in no event shall the total of such rental exceed the consideration of $52,500.00. The District Director or his delegate reserves the right to inspect the books of Liedtka, at his discretion, for the purpose of determining the gross revenue received by Liedtka under the operating rights received under this agreement.

3. It is understood and agreed that Liedtka has paid to the District Director under the terms of a Certificate of Sale of Seized Property, dated March 11, 1969, the amount of $52,500.00.

4. In the event the Commission approves the application of the parties for purchase and sale, then all amounts due under the lease shall be considered to have been paid in full.

5. If the Commission denies the application of the parties for purchase and sale, or if the Commission approves the transaction of purchase and sale, subject to conditions or limitations which vary or alter the terms of the agreement, and the agreement is terminated, then it is mutually agreed that on or before the date set by the Commission for termination of the lease, Liedtka shall return to the District Director the operating rights issued to Prospect Trucking Co., Inc. and the District Director shall refund the amount of $52,500.00 previously received less amounts due under paragraph 2 above.

The payments due under the agreement were retroactive to the date when petitioner first began using the routes, in May 1969. They were reflected as expense items on annual reports petitioner filed with the ICC, and reduced the $52,500 purchase price on deposit with the respondent. In June 1971 petitioner's application was given final approval by the ICC.

Under the terms of the agreement, the rental payments due for 1969, 1970, and 1971 were $10,926.53, $25,502, and $16,071, respectively. These amounts were deducted by petitioner on its income tax returns for those years as an ordinary expense of operations.

The amounts deducted in 1969 and 1970, respectively, represented 5 percent of the monthly gross revenues earned by petitioner under the operating rights as computed under the agreement. The amount deducted in 1971 represented 5 percent of such monthly gross revenues limited to the difference between the aggregate of the amounts in 1969 and 1970, and the total payment of $52,500. Respondent has disallowed this deduction in each year as follows:

The rental payments were contingent upon approval of the sale by the Commerce Commission. The rental payments were deemed to be purchase payments for the routes after the ICC approved the sales agreement.

* * * Upon approval of the sale by [the] ICC, the alleged lease option expense payments constituted payment for an asset with an indeterminable life, therefore, amortization is not allowable.

Petitioner, in connection with the acquisition of the operating routes, incurred legal fees of $3,725. These fees were deducted as an ordinary expense in petitioner's 1970 Federal income tax return. Respondent has disallowed this deduction as follows:

Legal expense in connection with the purchase of Prospect Trucking Company routes is not deductible under section 162 * * *. Since the expense was incurred in the purchase of an asset, in accordance with section 263, the expense is to be capitalized. * * *

### OPINION

This case involves two questions that have arisen from the petitioner's acquisition of the ICC operating rights at a sealed bid sale conducted by the respondent in March 1969. The first issue is whether the agreement executed in May 1970, before the sale became final, effectively created a leasing arrangement enabling the petitioner to deduct the payments due under the agreement as rental expenses under section 162(a)(3), or whether the acquisition price for these rights must be capitalized. The second issue is whether legal expenses incurred in connection with the acquisition of these operating rights qualify as an ordinary and necessary expense under section 162, or whether these expenses must be capitalized and included in the acquisition cost.

Although not presented in its usual context, the first issue requires us to characterize the transaction, by which the petitioner acquired the ICC operating rights, as a sale or a lease. In making this determination we are concerned with the substance, not the form of the transaction. Accordingly, we must consider all of the relevant facts and circumstances to determine the intent of the parties as it existed at the time the events occurred. *Northwest Acceptance Corp.,* 58 T.C. 836, 845 (1972), affirmed per curiam 500 F.2d 1222 (C.A. 9, 1974); *M & W Gear Co.,* 54 T.C. 385, 393 (1970), affirmed on this issue 446 F.2d 841 (C.A. 7, 1971).

Petitioner's main contention is that the agreement effectively transformed the transaction between the parties from a

conditional sale to a leasing arrangement nullifying petitioner's bid and the resulting certificate of sale of seized property. However, upon review of the agreement and the circumstances that led to its execution, petitioner's contention is not borne out.

From the beginning the petitioner was aware that the sealed bid sale was conditioned on subsequent ICC approval. After the sale the petitioner applied to the ICC for permanent transfer of the operating rights to its name and for temporary authority to use the rights pending final determination by the ICC. In its application for temporary use petitioner stated that it was not compelled to reimburse the respondent for this temporary use under the terms of the certificate of sale of seized property. The temporary authority was granted by the ICC on what was stated to be mutually agreeable terms. Originally then the subsequent agreement was not contemplated nor even deemed necessary.

As the petitioner began to use the operating rights under the temporary authority, it acquired additional equipment to service properly these new routes. Other expansion plans were devised pending final approval by the ICC. When its application had not been approved by the end of 1969, petitioner became concerned. Petitioner then entered negotiations with the respondent to develop a course of action that would hasten approval of its application. The agreement was the product of these negotiations, and was seen as a method to show the ICC that the petitioner was utilizing the operating rights in an appropriate manner and was qualified to have the operating rights transferred to it. Liedtka's own testimony at trial supports this conclusion.

The terms of the agreement also do not support petitioner's contention. The agreement states that the purchase price had been deposited with the respondent and, in the event of ICC approval, all amounts due under the agreement would be paid in full. The agreement also states that in no event shall the total of the rental payments due under it exceed the original purchase price on deposit.

We believe it unrealistic for petitioner to claim the existence of a leasing arrangement when the terms of the agreement allowed for the possibility of petitioner's using the operating rights without any obligation to pay the respondent for such use. This event actually occurred in 1971, before the ICC approval, when the full $52,500 purchase price had been exhausted by the payments due under the agreement and petitioner's use of the

operating rights continued. Petitioner's accountant also testified that these payments reduced the amount of the purchase price held in escrow by the respondent.

Petitioner cites the terminology of the agreement and argues that it evidences the true intent of the parties which was to create a leasing arrangement. The agreement does contain language that would be commonly found in a true lease and freely uses the terms "lease," "lessor," "lessee," and "rent." Possibly, these terms were used in an effort to be consistent with the order granting petitioner temporary authority to operate which referred to Prospect as the lessor and petitioner as the lessee. Under any circumstances, this Court is concerned with the substance of the questioned transaction, and not the form in which it is structured.

Petitioner also points out that in the event of the ICC's denial of its application, the respondent would be entitled to retain the payments made pursuant to the agreement. However, as will be discussed later, these payments were made with purpose to acquire a capital asset having a useful life in excess of 1 year. The fact that this purpose is ultimately unsuccessful does not change the character of these payments or make them ordinary and necessary business expenses. *Radio Station WBIR, Inc.*, 31 T.C. 803, 814 (1959); *Stass Reed*, 55 T.C. 32, 40 (1970).

The conclusions arrived at above are further reinforced by an analysis of the statutory authority under which the petitioner seeks to qualify its deduction. Section 162(a)(3) provides:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

* * *

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

As noted previously, petitioner was not compelled to enter into the agreement. It did so because it felt the agreement would strengthen its application for permanent transfer that was pending before the ICC. There is no evidence in the record that indicates the respondent required the petitioner to enter into the agreement. Consequently we do not believe the "payments [were]

required to be made as a condition to the continued use or possession" of the operating rights.

After the sealed bid sale was completed in March 1969 petitioner applied to the ICC for permanent transfer of the operating rights to its name. This application was not canceled when the agreement was executed. In fact, as heretofore noted, the agreement, which was forwarded to the ICC, was intended to enhance petitioner's application. The application remained in force and was eventually approved in June 1971. Petitioner then, throughout the existence of the agreement, was in the process of "taking title" to the operating rights.

Finally, the operating rights had been seized by the respondent for nonpayment of delinquent internal revenue taxes pursuant to section 6331. The effect of this seizure was to transfer the property to the possession of the United States. *In re Chicagoland Ideel Cleaners, Inc. v. Phelps*, 495 F.2d 1283, 1285 (C.A. 7, 1974), certiorari granted; *United States v. Pittman*, 449 F.2d 623, 627 (C.A. 7, 1971); *United States v. Sullivan*, 333 F.2d 100, 116 (C.A. 3, 1964). Upon seizure the property was then sold pursuant to section 6335 to the petitioner. The purchase price was placed in escrow and a certificate of sale of seized property was issued. Under these circumstances we believe the petitioner had "equity" in the property which was acquired from the respondent, the real "lessor" in actual fact. We believe this reasoning comports with that expressed in *C. James Mathews*, 61 T.C. 12, 19-22 (1973).

After careful consideration of the substance of this transaction and the statutory authority under which petitioner's deduction was claimed, we hold that a leasing arrangement was not created by the parties. The payments made represent the acquisition cost of the operating rights and must be included in its basis which will benefit the petitioner if it disposes of these operating rights. Respondent's determination must be upheld.

The second issue requires us to make a determination in the oft-litigated area of whether legal fees are properly deductible as an ordinary expense under section 162 or must be included as part of the acquisition cost of property pursuant to section 263 and section 1.263(a)-2(a), Income Tax Regs.[6] The Supreme

---

[6] SEC. 263. CAPITAL EXPENDITURES.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or better-

Court has rather recently held that the applicable test in this area would be whether the origin of the expenses was "in the process of acquisition itself," *Woodward v. Commissioner,* 397 U.S. 572, 577 (1970). Since the parties have agreed with respect to the amount of the legal fees in question and that their origin is attributable to the acquisition of the operating rights, the only remaining question is whether the operating rights constitute a capital asset.

The acquisition of these operating rights would enable the petitioner to use several routes between various points in New York, New Jersey, and Pennsylvania. This authority constitutes an intangible right to operate between these points and a permanent betterment to the petitioner's existing business. The ICC, in granting petitioner the permanent transfer, conditioned it only on petitioner's ability to provide the public continuous and adequate service. There is no indication in the record of the ICC's tendency to suspend, change, or revoke this authority. We can only assume then that the eventual final approval by the ICC that transferred these rights to petitioner's name was for an indefinite period.

Property, such as licenses and franchises, possessing these characteristics has been consistently considered to be a capital asset. *Toledo TV Cable Co. v. Commissioner,* 483 F.2d 1398 (C.A. 9, 1973), affirming per curiam 55 T.C. 1107 (1971); *Richmond Television Corporation v. United States,* 345 F.2d 901, 907 (C.A. 4, 1965); *Radio Station WBIR, Inc., supra* at 813. Expenditures then incurred in the acquisition of a capital asset cannot be deductible as ordinary expenses but must be treated as capital expenditures and included in its acquisition cost. *Woodward v. Commissioner, supra* at 574-575; *Dustin v. Commissioner,* 467 F.2d 47, 50 (C.A. 9, 1972), affirming 53 T.C. 491 (1969). Respondent's determination with respect to this issue must be upheld.

*Decision will be entered under Rule 155.*

ments made to increase the value of any property or estate. * * *

Sec. 1.263(a)-2. Examples of capital expenditures.

The following paragraphs of this section include examples of capital expenditures:

(a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year.