SURETY INSURANCE COMPANY OF CALIFORNIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Surety Ins. Co. v. Commissioner
Docket No. 4202-74.
United States Tax Court
T.C. Memo 1980-70; 1980 Tax Ct. Memo LEXIS 514; 39 T.C.M. (CCH) 1220; T.C.M. (RIA) 80070; March 13, 1980, Filed Frank I. Fullenwider, for the petitioner. John O, Kent, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1969
$13,026.15
1970
64,258.34 By amendment to his answer the respondent increased the deficiencies for 1969 and 1970 to $32,323.63 and $112,933.67, respectively. The issues presented for our decisions are: (1) Whether petitioner was an insurance company, within the meaning of section 831, [1] entitled *516 to compute its income in the manner provided in section 832. (2) Whether certain "doing business" license fees and legal fees expended to secure such licenses constitute deductible business expenses or should be treated as capital expenditures. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner is a California corporation whose principal offices were located in La Habra, California at the time its petition was filed in this case. Its articles of incorporation were filed with the California Secretary of State on January 31, 1969. The certificate provides, interalia, that: Article I
The name of this corporation is: SURETY INSURANCE COMPANY OF CALIFORNIA
Article II
The specific business in which this corporation is primarily to engage is that of acting as a surety insurer. On April 28, 1969, petitioner filed with the Insurance Commissioner of the State of California its application *517 for a permit authorizing it to issue and sell $2,500 shares of its $100 par value capital stock at a price of $200 per share to its parent corporation, Surety Managers, Inc., for the purpose of capitalizing itself so as to qualify for and receive a Certificate of Authority as a surety insurer in the State of California. The permit was issued on May 9, 1969. Petitioner thereafter received Certificates of Authority from the insurance regulatory authority (hereinafter "Insurance Commissioner" of the State of California, on May 26, 1969; New Mexico, on July 28, 1969; Alaska, on October 7, 1969; Texas, on January 5, 1970 and Colorado, on February 19, 1970. Such certificates authorized it as a California corporation to transact the class of insurance which under the Statutes of the State was designated or included "surety". Petitioner was required to secure such certificates as a prerequisite to its writing undertakings of bail in such States. In no case was a separate Certificate of Authority or license required for its bail underwritings. As a condition to obtaining a Certificate of Authority in California to transact surety insurance, petitioner was required to have a paid-in capital *518 of $250,000 and an equal amount of surplus. These capital and surplus requirements are applicable to insurance companies. After receiving its Certificate of Authority to transact business in California, petitioner was a required to maintain its paid-in capital unimpaired in order to avoid insolvency. Its then underwriting limitation (net limit on any one risk) was $45,000. On September 9, 1969, petitioner received a Certificate of Authority from the Department of the Treasury of the United States of America authorizing it as a California corporation to qualify as sole surety on recognizances, stipulations, bonds and undertakings permitted or required by the laws of the United States. The certificate was renewed for the fiscal year 1970-1971. During 1969 and 1970 the petitioner wrote fidelity and surety insurance coverages in the states where it held a Certificate of Authority, and its primary and predominant business activity was the writing of its undertakings of bail.During 1969 the gross premiums written by petitioner amounted to $813,679, of which $780,359 or 95.91 percent were from its undertakings of bail posted in California courts to secure the appearance of defendants *519 in criminal cases (hereinafter referred to as "defendants") prior to conviction. During 1970 the gross premiums written by petitioner were $3,337,140 of which $2,820,501 or 84.52 percent were its undertakings of bail posted in California courts to secure the appearance of defendants prior to conviction. During the years 1969 and 1970 petitioner was regulated by the Insurance Commissioner of each of the States in which it wrote its undertakings of bail. This regulation was as an insurance company authorized to transact surety insurance and not as some other type of an organization. After December 31, 1970 and prior to the date of trial in this case, petitioner was regulated by the Insurance Commissioners of the eleven additional States of Alabama, Arizona, Arkansas, Georgia, Kansas, Mississippi, Missouri, Nevada, Oklahoma, Oregon, and Washington as an insurance company transacting surety insurance. Petitioner was prohibited under California law from becoming a surety on any one bond, including undertakings of bail, in an amount in excess of 10 percent of its combined capital and surplus without reinsuring the excess. Petitioner was also required to maintain reserves in an *520 amount estimated in the aggregate to provide for the payment of all losses. Petitioner's investment of its capital, surplus and reserves were required to be made subject to the provisions applicable to surety insurance companies. Petitioner was required to file an annual statement on a form approved by the National Convention of Insurance Commissioners with the Insurance Commissioner of California. Similar statements were required in the other jurisdictions in which petitioner was authorized as a surety insurer. In this connection, petitioner was subject to examination by the California Insurance Commissioner to verify its compliance with the provisions regulating insurance companies. In 1969 and 1970 petitioner deducted the following disallowed amounts for "unpaid losses" and "unearned premiums" from its gross premiums received: Unpaid
Unearned
Year
Losses
Premiums
1969
$ 55,535.43
$36,548.27
1970
151,162.29
98,933.61
Unpaid losses consist of claimed but unpaid estimated losses reduced by any portion thereof recoverable by contractual agreement, and/or estimates of such losses which had been incurred but not claimed by the end of the year. Unearned *521 premiums represent prepaid insurance or surety premiums allocable pro rata to that portion of the contract term extending beyond the end of the taxable year in question. When petitioner was engaged as a surety on an appearance bond, the following form was utilized: Surety Insurance Company of California
(A California Corporation) PRINCIPAL OFFICE IN CALIFORNIA and HOME OFFICE, 2250 W. Whittier Boulevard, Mail, Address: Box 754, La Habra, California 90631 BAIL BOND No. (POWER OF ATTORNEY WITH THIS NUMBER MUST BE ATTACHED) IN THE COURT COUNTY OF STATE OF CALIFORNIA
THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, vs. Bk. # Cs. # Div Defendant having been admitted to bail in the sum of Dollars ($ ) and ordered to appear in the above-entitled Court on , 19 , on charge/s; (insert "misdemeanor" or "felony") Now, the SURETY INSURANCE COMPANY OF CALIFORNIA, a California corporation, hereby undertakes that the above named defendant will appear in the above-named court on the date above set forth to answer any charge in any accusatory pleading based upon the acts supporting the complaint filed against *522 him/her and all duly authorized amendments thereof, is whatever court it may be prosecuted, and will at all times hold him/herself amenable to the orders and process of the court and, if convicted, will appear for pronouncement of judgment or grant of probation or if he/she fails to perform either of these conditions, that the SURETY INSURANCE COMPANY OF CALIFORNIA, a California corporation, will pay to the people of the State of California the sum of Dollars ($ ).
If the forfeiture of this bond be ordered by the court, judgment may be summarily made and entered forthwith against the said SURETY INSURANCE COMPANY OF CALIFORNIA, a California corporation, for the amount of its undertaking herein, as provided by Sections 1305 and 1306 of the California Penal Code. SURETY INSURANCE COMPANY OF CALIFORNIA [SEAL], a california corporation/ The Premium Charged for this Bond is $ Per Annum. By: Attorney-in-Fact Bail Agent STATE OF CALIFORNIA, county of/; ss. On this day of , 19 , before me, a Notary Public in and for said County and State, residing therein, duly commissioned and sworn, personally appeared , known to me to be the *523 person whose name is subscribed to the within instrument as the Attorney-in-Fact of the SURETY INSURANCE COMPANY OF CALIFORNIA, a California corporation, and acknowledged to me that he subscribed the name of SURETY INSURANCE COMPANY OF CALIFORNIA, a California corporation, thereto as surety, and his own name as Attorney-in-Fact. IN WITNESS WHEREOF, I have hereunto set by hand and affixed my official seal the day and year in this certificate first above written. Notary Public in and for the County of State of California My Commission Expires Approved by me this day of , 19 Judge of the Court, County. Clerk of the Court, Judicial District, County. Jailer Jail, City of County of The undertaking would be signed by petitioner and its bail agent, an individual who usually obtained the bail business for petitioner. The relationship between petitioner and its bail agents was formalized by contract, which provided, inter alia, that: * * *
2. APPOINTMENT OF AGENT AND ACCEPTANCE OF APPOINTMENT. Company does hereby appoint Agent to act as its agent in said territory for the purpose of the *524 transaction of bail and immigration bonds. This appointment and this contract are effective on the date hereof if agent be properly licensed to so transact. If not they shall be effective on the date agent is so licensed. Agent accepts such appointment and agrees that he will during the duration of this agreement transact no such bonds except for Company, except as provided in paragraph 3 hereof. 3. REFERRING BUSINESS. If in the course of his business Agent through solicitation, negotiation or otherwise has an opportunity to write a bond which is not within Company's underwriting standards, is in excess of the limits which Company may write or which must be written outside of Agent's territory, Agent shall not write such bond but shall immediately transmit information with respect thereto to Company or its duly authorized representative to determine if any portion can be written through Company, its reinsurers or any other insurers with whom it has made arrangements to act as coinsurers. If Company then advises Agent that all or any portion of such bond cannot be written by Company, its reinsurers or coinsurers then Agent shall be free to refer such bond or such portion thereof *525 to other surety insurers. 4. AGENT'S DUTIES. In addition to performing all the specific duties required by the other provisions of this contract, Agent agrees to: a. Solicit, negotiate, execute, write and otherwise transact such bonds for Company in accordance with Company's underwriting standards. b. Use his best efforts to produce each and every person released on a bond written by him in court when required by the terms of the bond or by court order. c.Send immediate notice of any forfeiture declared on any bond written by him to Company. d. In general, use his best efforts to further the interests of Company. 5. COMPANY'S DUTIES. In addition to performing all the specific duties required by the other provisions of this contract, Company agrees to: a. Furnish the Agent with forms such as applications, bonds, powers of attorney, indemnity agreements, deeds of trust and similar matters as may be reasonably necessary to enable him to carry out this contract. b. Provide Agent with such other forms as may be necessary for the recording and reporting of business and which are furnished by it to its agents generally. c. Furnish Agent its underwriting standards *526 and rate schedules. d. Perform all duties required by its bonds written by Agent. e. File such powers of attorney as will permit Agent to conduct his agency. f. In general use its best efforts to further the interests of Agent. g. If in discharging such duties and in enforcing its rights under this contract Company uses authorized representatives, it shall notify Agent in writing of their authority. 6. STATUS OF AGENT. Agent acts for Company as an independent contractor and shall be master of his own time and effort. Nothing contained herein shall be construed to create the relationship of employee or employer between any of the parties to this contract. However, Agent shall be subject to the reasonable supervision of Company and shall not in the conduct of Company's business engage in any act of misrepresentation or violation of law or rules and regulations. In the conduct of his business, Agent may hire or employ sub-agents, solicitors, or employees. He shall be absolutely and solely responsible for them. Their acts in the conduct of his business shall be deemed the acts of Agent, and shall discharge Agent's responsibilities and duties and create obligations *527 on Agent's part in the same manner as if performed by Agent himself. Any bonds written by any of them shall be deemed to be written by Agent. Agent agrees that where required by law such persons have or will acquire and will continuously maintain all necessary licenses and permits required by any governmental authority. * * *
9. PREMIUMS. Agent shall charge and collect on behalf of Company premiums at such rates as may be prescribed by Company. Such premiums shall, unless otherwise provided in the bond itself or by law cover the period of one year from the effective date of such bond. For any period thereafter, Agent shall if permitted by the bond and law charge and collect an annual renewal premium at the rate then in effect by Company. All premiums less Agent's compensation shall be transmitted to Company in accordance with such routine as may be prescribed by Company. Agent shall have a grace period of 30 days following the due date of the renewal premium in which to collect and transmit it. No credit so far as Company is concerned is to be extended by Agent for either original or renewal premiums on bonds written by him and if any credit be so extended it shall *528 be for Agenths own account, and he shall account for and pay original and renewal premiums less his commissions to Company as though said premiums were collected at the time of the writing of the bond or of the annual renewal thereof. Should any powers of attorney be unaccounted for, lost or mislaid, such powers of attorney shall be considered as issued and posted for the maximum amount endorsed thereon, and Agent shall immediately report to Company a list of such powers of attorney, and pay therewith the full premium, less the applicable commission which would be due if such powers of attorney had been attached to bonds and the bonds written for the maximum amount of such power. Should any such powers of attorney thereafter be found and returned to Company with satisfactory evidence that the same had never been attached to bonds and that Company had never become liable thereon, Company shall refund all amounts paid thereon by Agent. 10. AGENT'S COMPENSATION. Agent's compensation shall be the commission computed in accordance with the Schedule of Charges attached hereto and by reference made a part hereof. Agent shall withdraw said commission from his trust account into his *529 personal account at the same time as he forwards to Company the balance of the premium paid on the bond upon which the commission is taken. Except as otherwise provided, Agent will pay all expenses of conducting his agency. Express and freight charges on articles or supplies sent by Company shall be paid by Company and all telephone calls and telegrams between Agent and any of the other parties to this agreement shall be paid by the initiating party. 11. INDEMNITY AGREEMENT. a. Agent will indemnify Company and any of its cosureties and reinsurers and save it and each of them harmless from any and all liability, loss, costs, damages, claims, suits, attorneys fees and expenses of whatever kind or nature which any of them may sustain or incur as a result of or in connection with any business transacted by Agent and in connection with the acceptance of any collateral deposited in connection with any such business. Agent shall not be responsible for the proper retention of tangible collateral which has been transferred to Company pursuant to paragraph 13. b. In discharging his liability pursuant to this paragraph 11 Agent shall perform or secure the performance of all of *530 Company's obligations on all bonds written by Agent including the making of any investigation on account of such bond, defending or prosecuting any legal action, suit or other proceeding which may be brought in connection with any such bond or the collateral therefor, paying all obligations arising thereon, obtaining or attempting to obtain a release from liability under any such bond or in locating, extraditing or surrendering any person bonded. c. If in any particular transaction or in connection with any particular bond Agent is not carrying out his obligations pursuant to this paragraph or lacks the financial capacity to carry out such obligations, Company may, upon notification to Agent, discharge the Agent's liability hereunder at the expense of Agent. An itemized sworn statement of such expenses shall be accepted as prima facie evidence of the fact and extent of any such expenses in any and all suits hereunder. d. This indemnity agreement inures to the benefit of Company and any cosurety or reinsurer and their successors or assigns so as to give any of them a direct right of action against Agent. 12. INDEMNITY FUND. * * *
13. PRINCIPAL'S COLLATERAL. All *531 money, securities and all other collateral, received by Agent in connection with Company's bonds written by him shall, except as hereinbelow required, be immediately turned over by him to Company in accordance with such instructions as may be given and upon receipt by Company shall be held by it for the purposes for which it was deposited. Responsibility for collateral prior to its receipt by Company shall be that of the Agent. Cash collateral received by Agent on bail bonds in accordance with a court promulgated bail schedule, where no appearance of a defendant is required and bail may be forfeited in lieu thereof, may be retained by Agent, but solely for the purpose of discharging the anticipated forfeiture. If because of any forfeiture of bond or other loss, cost, or expense, it is necessary to convert collateral received from any principal or his indemnitors and guarantors to cash, Company shall determine which of the parties to this contract should undertake the conversion. However, all expenses thereof shall be charged, first, to the collateral if the terms under which it was taken permit, and then to Agent. * * *
It was the policy of petitioner and its bail agents *532 to obtain indemnification agreements and sufficient collateral from the defendants.
Petitioner incurred legal fees of $540 in 1969 and $4,525 in 1970 in connection with the securing of Certificates of Authority to do business as a surety insurance company in various states other than California. In addition, petitioner incurred in 1969 license fees and fees to obtain licenses in various states other than California in the amount of $4,057. These license fees and legal expenses were deducted by petitioner on its 1969 and 1970 Federal corporation income tax return. OPINION Issue 1--Undertakings of Bail as Insurance
The primary issue is whether undertakings of bail by a corporate surety insurance company constitute contracts of insurance for purposes of section 831[2] and 832 [3] of the Internal Revenue Code. *533 To be treated as an insurance company other than a life or mutual insurance company under section 831, and to obtain the benefits available under section 832 for computation of taxable income, the company must demonstrate that the predominate character of its business actually done in the taxable year constitutes insurance. Sections 1.831-1(a), 1.801-1(b)(2), 1.801-3(a), Income Tax Regs.; Bowers v. Lawyers Mortgage Co.,285 U.S. 182 (1932); United States v. Home Title Insurance Co.,285 U.S. 191 (1932); United States v. Cambridge Loan and Building Co.,278 U.S. 55 (1928). The company's name, charter powers, and subjection to state insurance laws, though significant in determining the business which a corporation is authorized to carry on, are not determinative of the issue of whether the business actually done constitutes insurance. Sections 1.801-1(b)(2), 1.801-3(a), Income Tax Regs. The parties agree that petitioner was primarily engaged in *534 the business of acting as surety for undertakings of bail in California during the years in issue, and that it can be considered an insurance company only if the contracts made in the course of that business are insurance contracts. We have previously considered this issue in Allied Fidelity Corp. v. Commissioner,66 T.C. 1068 (1976), affd. 572 F.2d 1190 (7th Cir. 1978), cert. denied 439 U.S. 835 (1978). In that case we stated at 66 T.C. 1074-1076: In common understanding, an insurance contract is an agreement to protect the insured (or a third-party beneficiary) against a direct or indirect economic loss arising from a defined contingency. The insurer undertakes no present duty of performance but stands ready to assume the financial burden of any covered loss. 1 Couch, Insurance 2d, sec. 1:2 (1959). An essential feature of insurance is this assumption of another's risk of economic loss. 1 Couch, supra, sec. 1:3. By contrast, the principal obligation of the bail surety at common law was to produce the defendant at trial, an obligation for which the monetary bond was merely an assurance of, or inducement to, performance. *535 United States v. Ryder,110 U.S. 729, 734 (1884). Broad powers over the defendant's person were conferred upon the surety to aid in the performance of this duty, including the power to arrest. His undertaking thus resembled a contract to perform services--to stand in the jailer's shoes as custodian of the accused--rather than a contract of insurance. If the defendant failed to appear for trial, the surety's bond was forfeited, not to reimburse the State for the loss of the defendant's person but as a penalty for the surety's own failure to perform. Petitioner points to language in some judicial opinions to support its contention that the foregoing model of the bail system is outdated. In Leary v. United States,224 U.S. 567, 575-576 (1912), the Supreme Court stated: The distinction between bail and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary.If * * * the bond was for $40,000, that sum was the measure of the interest on anybody's part, and it did not matter to the Government what person ultimately felt the loss so long as it had the obligation it was *536 content to take. * * * In a similar vein is United States v. Davis,202 F.2d 621, 625 (7th Cir. 1953): The bond is a contract between the surety and the government that if the latter will release the principal from custody the surety will undertake that the principal will appear personally at any specified time and place to answer. * * * When [the bondsman] writes a bond he assumes the great risk involved if his faith is misplaced in the person who executes the bond as principal. * * * Petitioner argues that these cases envision a quite different role for the surety--that of simply guaranteeing payment of any forfeiture which might be incurred by reason of the defendant's nonappearance. Petitioner's attempt to seize upon the foregoing language, obviously uttered in a nontax context, is of no avail. Most courts have not followed Leary's de-emphasis of the bondsman's personal obligation. Modern cases continue to assert that payment of the bond is not a substitute for performance of the surety's obligation to produce the defendant. Continental Casualty Co. v. United States,314 U.S. 527 (1942); *537 Concord Casualty & Surety Co. v. United States,69 F.2d 78 (2d Cir. 1934); United States v. Melville,309 F. Supp. 824 (S.D.N.Y. 1970). See also United States v. Field,193 F.2d 92, 99 (2d Cir. 1951). The most that can be said is that the surety undertakes that the defendant will appear for trial or, alternatively, that the amount of the bond will be forfeited. In re Lexington Surety & Indemnity Co.,272 N.Y. 210, 5 N.E. 2d 204 (1936). The latter is subordinate and incidental to the former. Cf. Bowers v. Lawyers Mortgage Co.,supra.The focus of the bail system remains on balancing the accused's interest in personal liberty against the giving of adequate assurance of his presence during the criminal proceedings ( Stack v. Boyle,342 U.S. 1 (1951)), not on protecting the Government against economic loss. Thus, the surety is still regarded as contracting principally to assume the Government's duty of supervising the defendant, rather than to compensate it for an economic loss. Although *538 in form petitioner undertook to pay the amount of the bond if the defendant did not appear and did not pay, substantively petitioner had a direct obligation and the risk to which it subjected itself was the risk of failure in its own duty; this is not a risk assumed from another, as in an insurance contract. In any event, even if we were to view the obligation as being that of the defendant himself with petitioner as being only contingently responsible, the further requirement that the risk involved be one of economic loss would still not be met. Notwithstanding the additional arguments made by the petitioner in this case, we adhere to our holding in Allied Fidelity Corp. v. Commissioner,supra, that undertakings of bail do not constitute insurance. We concur in Allied's characterization of the personal role that petitioner assumes in the bail process. Although it is true that the surety rarely maintains actual custody of the defendant, the courts continue to view the surety as having constructive custody of the defendant at all times when the defendant is out on bail. See, *539 e.g. People v. United United Bonding Insurance Co.,79 Cal. Rptr. 579 (Cal. App. 2d 1969); People v. United Bonding Insurance Co.,77 Cal. Rptr. 310 (Cal. App. 2d 1969). In this regard the surety is obligated to maintain knowledge of the defendant's whereabouts at all times, e.g. United States v. Marquez,564 F.2d 379, 380 (10th Cir. 1977); it must assist the state in locating the defendant if the defendant fails to appear as required, e.g. United States v. Field,193 F.2d 92, 99-102 (2d Cir. 1951); it may arrest and surrender the defendant to the court for purposes of the bail's exoneration, Cal.PenalCode Secs. 1300, 1301 (West); and it may avoid forfeiture of its undertaking by producing the defendant in court within 180 days after the initial failure to appear as required or by apprehending and surrendering the defendant during the same period, Cal.PenalCode Secs. 1305, 1306 (West). Thus, it is apparent that the surety's role is not perceived as a mere guarantor of defendant's appearance but as having an obligation to produce the defendant as required for the administration of *540 criminal justice. Acknowledging that we might continue to view its undertaking of bail as a service contract, the petitioner argues that many forms of insurance have service elements which do not thwart their classification as insurance for Federal tax purposes. Petitioner refers to provisions in casualty policies where an insurer has the option of paying the insured or replacing the property or in boiler and machinery insurance and title insurance where the insurer provides substantial services as part of the premium charged. In our view these analogies are unpersuasive.In the examples cited by petitioner it is clear that the predominate purpose of the contracts is the assumption by the insurer of a certain economic risk of loss. This, of course, begs the ultimate question--is there an assumption of an economic risk of loss in an undertaking of bail? We think not, as we have previously stated in our Allied opinion. The function of bail is to ensure the presence of the defendant for trial and, if convicted, for sentencing. The interest in the criminal justice system is not economic but rather the socially desirable end of properly punishing those convicted of crimes. The *541 payment of a forfeiture by a surety cannot compensate the government for the loss of that goal. Allied Fidelity Corp. v. Commissioner,572 F.2d 1190, 1192 (7th Cir. 1978). Moreover, the Court of Appeals for the Seventh Circuit indicated in its affirmance of our Allied opinion: The loss to the state by an accused fleeing, which is the "risk" to the state, may be societal, legal, or moral, but certainly is not merely a pecuniary one. This is best exemplified by the fact that if a forfeiture payment by [petitioner] were true insurance, that payment would make the state whole, fully compensated for its loss. Yet, as is obvious, the state can only be made whole by the recapture of the accused and the resulting vindication of the rights of society. For it is society that the criminal process protects and the payment of a sum by [petitioner] does not satisfy that interest until the state regains the ability to punish those who break the law. [Petitioner's] principal obligation is to produce the accused at trial. The monetary obligation is merely an assurance of, or inducement to perform, that principal obligation. [572 F.2d at 1193]. *542 Petitioner argues that an economic risk exists in the costs that the criminal justice system incurs when a defendant fails to appear as required. This risk of economic loss, petitioner maintains, is borne by the surety through the criminal justice system's utilization of the forfeited bail proceeds. Petitioner refers us to Cal.PenalCode Secs. 1305 and 1306 (West) where a surety may be discharged from a forfeiture under certain limited conditions. In such discharge the court may retain some portion of the bail for costs incurred in apprehending the defendant. Such costs vary on the need for extradition and whether the defendant's surrender is voluntary or involuntary. Petitioner contends that some part of the bail forfeiture clearly relates to the economic risk inherent in the defendant's failure to appear. Once again, petitioner refers us to other forms of insurance in which the amount of insurance may exceed actual economic loss, such as a "valued" casualty policy. Nevertheless, we think petitioner's assertion that the criminal justice system views some part of the forfeiture as coverage for the economic cost involved in apprehending a defendant is inaccurate. *543 For example, under the statutory scheme in California for setting bail, the court must take into consideration the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his appearing at the trial or hearing of the case. Cal.PenalCode Sec. 1275 (West). There is no suggestion in that statute that the anticipated costs of apprehending a fleeing defendant should determine the amount of bail fixed. Moreover, as we have previously indicated, the courts have always construed the purpose of bail to be assurance that the defendant will appear as required. The most that can be said for the provision in the California Penal Code which authorizes a discharge of the forfeiture up to the amount of costs incurred by the State in issuing bench warrants, extradition, etc., is that such provision provides a further incentive for the surety to perform its obligations. Thus, an examination of Cal.PenalCode Sec. 1305 (West) reveals that discharge may be granted if the surety, within 180 days after the initial failure to appear as required, either surrenders the defendant to the court or to custody or the defendant and *544 his surety appear and satisfactorily excuse the defendant's neglect or show to the satisfaction of the court that the absence of defendant was not with the connivance of the surety. In addition, discharge will be granted where a surety is permanently incapable of performing its obligations, such as in the death, illness or insanity of the defendant or his detention by civil or military authorities. In conclusion, we are unable to find that the initial determination of bail contemplates an economic risk of loss to the state or that Cal.PenalCode Sec. 1305 (West) is persuasive authority for the premise that economic risk of loss is a primary purpose in the undertaking of bail. [4]
*545 Petitioner also contends that this Court in Allied did not fully consider the significance of state regulation and taxation of the surety insurance company as an insurance company. Petitioner has clearly demonstrated that it is regulated as an insurance company and taxed like an insurance company by the states in which it does business. Nevertheless, these factors, while significant, are not controlling in the determination for Federal tax purposes of whether its business constitutes insurance. As we stated in Allied Fidelity Corp. v. Commissioner,66 T.C. 1068, 1074 (1976), "[such] regulation amounts to no more than a recognition that a corporate bail bondsman is ordinarily an insurance or surety company, not that bail bonding is insurance." We note that in California an individual bail bondsman is not regulated in the same manner as a surety insurance company. See Cal.PenalCode Secs. 1278, 1279, 1287 (West) and Cal.Ins.Code Secs. 1800-1822 (West). Accordingly, we conclude that petitioner's undertakings of bail do not constitute *546 insurance for purposes of section 831. Since petitioner's predominate activity was the writing of bail undertakings, it does not qualify for the treatment afforded certain insurance companies under section 832.
Issue 2--License and Legal Fees
Petitioner contends that license and legal fees incurred in obtaining certificates of authority to conduct its business as a surety in Alaska, New Mexico, Texas and Colorado constitute ordinary and necessary business expenses deductible under section 162. Respondent, on the other hand, would characterize these fees as capital expenditures. We agree with respondent. Petitioner first contends that the expenses merely represent usual operating expenses. We cannot agree. These expenditures are directly related to the acquisition of the right to conduct surety business in a given area. We have held on numerous occasions that the costs of acquiring licenses and franchises having useful lives in excess of one year are not deductible as business expenses but should be treated as capital expenditures. P. Liedtka Trucking, Inc. v. Commissioner,63 T.C. 547, 555 (1975); *547 Toledo TV Cable Co. v. Commissioner,55 T.C. 1107, 1119 (1971), affd. per curiam, 483 F.2d 1398 (9th Cir. 1973); Radio Station WBIR, Inc. v. Commissioner,31 T.C. 803, 815 (1959); Nachman v. Commissioner,12 T.C. 1204 (1949) affd. 191 F.2d 934 (5th Cir. 1951). Alternatively, the petitioner argues that the useful life of each certificate of authority is only one year since it must renew its certificates annually. However, an examination of the Texas and Alaska statutes reveal that once a certificate of authority is granted, such authority remains in effect as long as the company complies with the regulatory scheme of each state and upon payment of an annual continuation fee. See AlaskaStat. Sec.s 21.09.010-21.09.280; TexasIns.CodeAnn., article 2 (Vernon). In Colorado and New Mexico the certificate of authority will be renewed annually provided certain filing requirements and continued compliance with the regulatory scheme are met. See N.M.Stat.Ann. Secs. 58-5-1, 58-5-18; Colo.Rev.Stat. Sec. 10-3-105. Thus, it is apparent that a company initially *548 granted certificates of authority will not be denied renewal unless the company fails to comply with the regulatory scheme. As such, the license is realistically not intended nor limited to a single year where petitioner complies with state law. See P. Liedtka Trucking, Inc. v. Commissioner,63 T.C. 547, 555 (1975). Accordingly, we conclude that such expenditures may not be deducted as business expenses but must be treated as capital expenditures. [5]
In view of other adjustments contained in the stipulation of the parties, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue, unless otherwise noted.↩
2. SEC. 831 TAX ON INSURANCE COMPANIES (OTHER THAN LIFE OR MUTUAL), MUTUAL MARINE INSURANCE COMPANIES, AND CERTAIN MUTUAL FIRE OR FLOOD INSURANCE COMPANIES. (a) Imposition of Tax.--Taxes computed as provided in section 11 shall be imposed for each taxable year on the taxable income of-- (1) every insurance company (other than a life or mutual insurance company), (2) every mutual marine insurance company, and (3) every mutual fire or flood insurance company-- (A) exclusively issuing perpetual policies, or (B) whose principal business is the issuance of policies for which the premium deposits are the same, regardless of the length of the term for which the policies are written, if the unabsorbed portion of such premium deposits not required for losses, expenses, or establishment of reserves is returned or credited to the policyholder on cancellation or expiration of the policy. ↩
3. SEC. 832. INSURANCE COMPANY TAXABLE INCOME. (a) Definition of Taxable Income.--In the case of an insurance company subject to the tax imposed by section 831, the term "taxable income" means the gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c). (b) Definitions.--In the case of an insurance company subject to the tax imposed by section 831-- (1) GROSS INCOME.--The term "gross income" means the sum of-- (A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners. (B) gain during the taxable year from the sale or other disposition of property, (C) all other items constituting gross income under subchapter B, except that, in the case of a mutual fire insurance company described in section 831(a)(3)(A), the amount of single deposit premiums paid to such company shall not be included in gross income. (D) in the case of a mutual fire or flood insurance company described in section 831(a)(3)(B), an amount equal to 2 percent of the premiums earned on insurance contracts during the taxable year with respect to policies described in section 831(a)(3)(B) after deduction of premium deposits returned or credited during the same taxable year, and (E) in the case of a company which writes mortgage guaranty insurance, the amount required by subsection (e)(5) to be subtracted from the mortgage guaranty account. * * *
(3) UNDERWRITING INCOME.--The term "underwriting income means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred. (4) PREMIUMS EARNED.--The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows: (A) from the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. (B) to the result so obtained, add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year. * * *
(5) LOSSES INCURRED.--The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows: (A) to losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year. (B) to the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.↩
4. Having determined that the purpose of bail is to ensure defendant's presence as required and not to protect the criminal justice system against risk of economic loss, we consider it unnecessary to deal extensively with petitioner's argument that it assumed an economic risk of forfeiture from the defendant. Petitioner premises its argument on the basis that a defendant who posts his own bail might lose the money if he fails to appear and by utilization of a surety transfers that risk to the surety. As we have noted earlier, the surety personally undertakes to have defendant appear. It is the surety's failure to perform which results in the forfeiture. Even if we accepted the notion that a risk was transferred from defendant to petitioner, petitioner usually requires collateral for the posting of bond and ordinarily requires that the bail agent and defendant agree to indemnify it. Thus the issue of whether a true assumption of risk of loss is present would remain to be answered. See, Cuesta Title Guaranty Co. v. Commissioner,71 T.C. 278 (1978); Carnation Co. v. Commissioner,71 T.C. 400↩ (1978).
5. Petitioner also argues that its limited ability to transfer the certificates of authority should justify deductibility of the costs incurred in obtaining such certificates as business expenses. Such an argument is without merit.See Commissioner v. Lincoln Savings & Loan Association,403 U.S. 345, 355↩ (1971).